UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ADHAM AMIN HASSOUN,

             Petitioner,

       v.

JEFFREY SEARLS, in his official
capacity as Acting Assistant Field Office
Director and Administrator of the Buffalo
Federal Detention Facility,

             Respondent.

_____

**DECISION AND ORDER**

1:19-CV-00370 EAW

## <u>INTRODUCTION</u>

Petitioner Adham Amin Hassoun ("Petitioner") is a civil immigration detainee currently housed at the Buffalo Federal Detention Facility (the "BFDF") in Batavia, New York, who seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and 8 U.S.C. § 1226a(b), arguing that his current detention is unauthorized by lawful statute or regulation and that he must be released, with appropriate conditions of supervision. (Dkt. 13). An evidentiary hearing is presently scheduled to commence on April 28, 2020. (Dkt. 71). Respondent Jeffrey Searls, the Acting Assistant Field Office Director and Administrator of the BFDF ("Respondent") has moved to adjourn the evidentiary hearing in light of the ongoing global Coronavirus Disease 2019 ("COVID-19") pandemic. (Dkt. 120). Specifically, Respondent requests that the hearing be adjourned until four weeks

after this District lifts its COVID-19 based restrictions on courthouse access. (Dkt. 120-1 at 15-16).

In response, Petitioner has filed a motion for transfer to home incarceration. (Dkt. 122). Petitioner's position on Respondent's motion to adjourn depends on the outcome of his motion for transfer to home incarceration—Petitioner does not oppose the motion if his request is granted, but he does oppose it if his request is denied. (Dkt. 122-1 at 8 n.1).

For the reasons discussed below, the Court denies Petitioner's motion for release to home incarceration and grants in part Respondent's motion to adjourn the evidentiary hearing.

## BACKGROUND

The factual and procedural background of this matter is set forth in detail in the Court's Decision and Order of December 13, 2019 (Dkt. 55), familiarity with which is assumed for purposes of the instant Decision and Order. The Court sets forth additional salient facts below.

## I.   The COVID-19 Pandemic

COVID-19 has caused a global pandemic and public health emergency. According to the World Health Organization, as of the afternoon of April 10, 2020, there were 1,524,161 confirmed cases of COVID-19 worldwide, with 92,941 confirmed deaths and 213 countries, areas, or territories impacted. *See Coronavirus Disease (COVID-19) Pandemic*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited Apr. 10, 2020). According to reports in the *New York Times*, as of the afternoon of April 10, 2020, the U.S. tallies include at least 483,600 people across

every state, plus Washington, D.C., and four U.S. territories, who have tested positive for the virus and at least 16,000 patients with the virus who have died.  *See* Jin Wu, et al., *Coronavirus Map: Tracking the Global Outbreak*, N.Y. Times, https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited Apr. 10, 2020).  These numbers likely do not capture the full impact of the disease because of the lack of adequate testing.  *See generally* Caitlin Dewey, *Sick, Undiagnosed and Anxious: Most People with Covid-19 Symptoms Can't Get Tested*, Buffalo News (Mar. 29, 2020), https://buffalonews.com/2020/03/29/shift-in-covid-19-testing-priorities-leaves-some-residents-sick-undiagnosed-and-anxious/.

Although much remains unknown about COVID-19, the available data indicates that it poses a greater risk to older individuals and individuals with underlying health conditions such as asthma, heart disease, and diabetes.  *See Coronavirus Disease 2019 (COVID-19), Groups at Higher Risk for Severe Illness*, Ctrs. for Disease Control & Prevention (Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.  There is also concern that correctional and detention facilities pose particular challenges in halting the spread of the virus.  *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control & Prevention (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting.  The integration of these components presents unique challenges

for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors.").

On March 7, 2020, Governor Andrew Cuomo declared a state of emergency for all of New York State related to COVID-19.  *See* N.Y. Exec. Order No. 202 (Mar. 7, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf.  The World Health Organization characterized COVID-19 a pandemic on March 11, 2020.  *Coronavirus Disease 2019 (COVID-19) Situation Report 51*, World Health Org. (Mar. 11, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10.  On March 13, 2020, President Donald Trump declared a national emergency.  Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).

To aid efforts to halt the spread of COVID-19, the Centers for Disease Control and Prevention (the "CDC") advise the public to engage in "social distancing," to limit community movement,  and to cancel non-essential travel (including work travel).  Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Ctrs. for Disease Control & Prevention (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.  The executive branch of the federal government has implemented the CDC's guidance by taking steps to minimize face-to-face interactions and to limit travel.  (Dkt. 120-1 at 4-5).

New York State has adopted extreme measures to address the COVID-19 pandemic.  On March 20, 2020, Governor Cuomo signed the "New York State on PAUSE" Executive

Order, which, among other things, mandated a 100% closure of non-essential businesses statewide and temporarily banned all non-essential gatherings of individuals of any size for any reason other than the provision of essential services. *New York State on PAUSE*, New York State, https://coronavirus.health.ny.gov/new-york-state-pause (last visited Apr. 10, 2020). This policy has been extended through at least April 29, 2020. *Amid Ongoing COVID-19 Pandemic, Governor Cuomo Announces NYS On Pause Functions Extended for Additional Two Weeks*, New York State (Apr. 6, 2020), https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-announces-nys-pause-functions-extended-additional. All schools in New York State have been closed through at least April 29, 2020. *Id.* Fines of up to $1000 may be imposed for violation of New York State's social distancing protocols. *Id.*

This District has also taken action to curb the spread of COVID-19. On March 13, 2020, Chief Judge Frank P. Geraci, Jr., signed a General Order regarding Court Operations Under the Exigent Circumstances Created by COVID-19 continuing all civil jury trials, grand jury selections, and naturalization ceremonies for 60 days and encouraging individual judges to limit other in-person appearances to the extent practicable. On March 18, 2020, Chief Judge Geraci entered a second General Order regarding Criminal Jury Trials Under the Exigent Circumstances Created by COVID-19 continuing all criminal jury trials scheduled to commence through May 13, 2020. The District has also imposed visitor restrictions in its courthouses.

## II.    **Petitioner's Conditions of Confinement**

Petitioner was born on April 20, 1962, and is currently 57 years old.  (Dkt. 13 at ¶ 19).  He suffers from a number of health conditions, including asthma, coronary artery disease, hypertension, type 2 diabetes, and hyperlipidemia.  (Dkt. 122-4 at ¶ 3).  Petitioner has been hospitalized multiple times during his detention at the BFDF, most recently from February 21, 2020, to February 23, 2020.  (*Id*. at ¶¶ 6-7).  Despite his health issues, in mid-February 2020, Petitioner began a hunger strike to protest his ongoing detention.  (*Id*. at ¶ 8).  Petitioner's health care providers at the BFDF have urged him to eat more frequently to boost his immune system, but he "remains on hunger strike," and is "typically eating one meal every other day in order to keep [his] strength and not to collapse and be a burden on the health care facilities."  (*Id*. at ¶¶ 10, 14).

Petitioner is currently housed in medical isolation in the Special Housing Unit ("SHU") at the BFDF.  (Dkt. 145 at ¶ 24).  He is placed in a single-occupant cell with a solid metal door and glass window.  (*Id*.).  The SHU has beds for 32 detainees, but currently houses only 13.  (Dkt. 140-2 at ¶ 12).  Petitioner's cell has its own shower, an individual toilet and sink, and soap and shampoo for cleaning.  (*Id*. at ¶¶ 13-14).

The BFDF has taken steps to prevent the spread of COVID-19 within the facility. Captain Abelardo Montalvo, M.D., who is employed by Immigration and Customs Enforcement ("ICE") as the Eastern Regional Clinical Director for the ICE Health Services Corps, and who provides oversight for the medical facilities at the BFDF, has submitted a sworn declaration in opposition to Petitioner's request for release.  (Dkt. 145).  Captain Montalvo details the actions that have been taken at the BFDF, including the following:

(1) the BFDF is currently at just over half-capacity, having capacity for 716 detainees and housing 390; (2) all detainees arriving at the BFDF are screened for symptoms of COVID-19 and quarantined for 14 days thereafter; (3) the facility is cleaned several times per day, including all common areas, with disinfectants; (4) detainee workers are provided with personal protective equipment ("PPE") including goggles and gloves; (5) staff at the BFDF have access to handwashing stations, alcohol-based hand sanitizer disinfectant wipes, and PPE; (6) detainees at the BFDF have continual access to handwashing stations with soap; (7) personal visits have been temporarily disallowed; (8) visits with legal counsel are held in a no-contact room with a plastic window barrier; (9) gatherings of detainees have been cancelled and social distancing is being practiced by staff to the fullest extent possible; and (10) all staff and visitors to the BFDF, including delivery persons, have their temperatures checked before entering BFDF grounds.  (*Id*. at ¶¶ 7-19).

As of April 8, 2020 (the date of Captain Montalvo's declaration), there were zero confirmed cases of COVID-19 among staff or detainees at the BFDF.  (*Id*. at ¶ 29).  Three detainees who had complained of symptoms that could be indicative of COVID-19 had been placed in isolation in the medical bay.  (*Id*. at ¶ 30).  An additional five detainees who were in close contact with those three individuals had been placed in isolation in the SHU.  (*Id*. at ¶ 31).  At that time, Captain Montalvo reported that the closest any of these individuals' cells was to Petitioner's cell was 150 feet.  (*Id*. at ¶ 38).

On April 9, 2020, Respondent informed the Court that four cases of COVID-19 had been confirmed in the BFDF.  (Dkt. 141; Dkt. 148).  Captain Carlos M. Quinones, M.D., Clinical Director for ICE with oversight authority for the BFDF, has submitted a sworn

declaration stating the following: (1) the four confirmed cases are among the eight individuals who had previously been isolated; (2) these four individuals are currently housed in isolation in the SHU and are at least 50 feet from Petitioner's cell; (3) Petitioner does not share any space with these four individuals; (4) Petitioner has been provided an assigned tablet; (5) the B-2 Unit, in which the four individuals were previously housed, has been isolated from the rest of the population and will remain so for 14 days; (6) medical personnel, when interacting with all detainees including Petitioner, are wearing face shields, face masks, gloves, and gowns; and (7) officers are wearing face masks and gloves and keeping a safe distance from all detainees.  (Dkt. 148 at ¶¶ 5-8).  Captain Quinones further states that Petitioner will be provided with N95 or surgical masks upon request.  (*Id.* at ¶ 8).

Petitioner makes factual claims in support of his motion for release that are contradicted by Respondent.  Petitioner asserts that he has three health checks per day and that the medical providers "sometimes do not wear masks or gloves."  (Dkt. 122-4 at ¶ 24).  However, Captain Quinones confirms in his declaration that medical personnel are now wearing full PPE when interacting with detainees, including face shields, face masks, gloves and gowns.  (Dkt. 148 at ¶ 8).  Petitioner also claims that he is not permitted to access disinfectant sprays to sanitize shared areas or items including computers, telephones, and microwaves—according to Petitioner, he "can only use napkins and water to sanitize items."  (Dkt. 122-4 at ¶ 6).  In opposition, Respondent has sworn under penalty of perjury that Petitioner has continual access to disinfectant sprays and cleaning materials, including two specific disinfectants that have been registered in New York for use against

COVID-19. (Dkt. 140-2 at ¶¶ 16-18). Captain Quinones also states that Petitioner has an assigned tablet. (Dkt. 148 at ¶ 6). The Court credits these statements by Respondent, Captain Montalvo, and Captain Quinones, which were made more recently than Petitioner's statements and reflect the rapidly evolving environment in which all parties now find themselves. Moreover, while Petitioner submitted a reply declaration without leave of Court[1] addressing certain other issues as discussed below, Petitioner did not contradict these salient facts as set forth above.

On April 9, 2020, Petitioner's counsel submitted a declaration relaying the contents of a phone call he had with Petitioner earlier that day. (Dkt. 149). According to Petitioner's counsel, Petitioner is currently experiencing a gastrointestinal illness. (*Id*. at ¶¶ 3-4). Medical providers checked on Petitioner in his cell, and counsel reports that Petitioner claimed they had done so after attending to individuals who are infected with COVID-19. (*Id*. at ¶ 4). Petitioner told counsel that he was swabbed for COVID-19 and his results remain outstanding. (*Id*. at ¶ 7). Petitioner also told counsel that the COVID-19 patients' cells are "adjacent" to the SHU's law library. (*Id*. at ¶ 10). Petitioner further told counsel that "[t]he detainees who are infected with COVID-19 have been permitted to walk outside their cells within the SHU." (*Id*. at ¶ 17).

---

[1]     Petitioner expressly waived the right to file reply papers in connection with his motion for emergency release. (Dkt. 122 at 2). As such, Petitioner should have sought leave of Court prior to filing this declaration. While the Court has nonetheless considered the content of Petitioner's counsel's declaration, counsel is cautioned that future submissions must be procedurally compliant.

### III.  **Procedural History of the Instant Motions**

Respondent filed his motion to adjourn the evidentiary hearing on March 31, 2020. (Dkt. 120).  In response, Petitioner filed his motion for transfer to home incarceration, and an accompanying motion to expedite, on April 2, 2020.  (Dkt. 122; Dkt. 123).  The Court granted the motion to expedite in part, and required Petitioner to file a response to Petitioner's motion and any reply in further support of his motion by April 7, 2020.  (Dkt. 124).

On April 6, 2020, Petitioner filed a motion for leave to file a supplemental declaration in support of his motion.  (Dkt. 127).  The Court granted Petitioner's motion, but adjourned Respondent's deadline to April 8, 2020, to permit Respondent time to respond to the newly submitted material.  (Dkt. 128).

Also on April 6, 2020, a group of self-described public health and human rights experts filed a motion for leave to file a brief of *amici curiae* in support of Petitioner's motion.  (Dkt. 135).  The Court denied the motion on April 7, 2020.  (Dkt. 136).

Respondent filed his response to Petitioner's motion and reply in support of his motion on April 8, 2020.  (Dkt. 140).  On April 9, 2020, Respondent filed a letter update informing the Court that four COVID-19 cases had been confirmed at the BFDF.  (Dkt. 141).  The Court ordered Respondent to submit a sworn declaration containing additional information about the confirmed COVID-19 cases by no later than 5:00 p.m. on April 9, 2020 (Dkt. 144), which Respondent did (Dkt. 148).  Despite having waived the right to file reply papers (*see* Dkt. 122 at 2), Petitioner's counsel thereafter filed a declaration on April 9, 2020.  (Dkt. 149).

**DISCUSSION**

## I.    Petitioner's Motion for Release to Home Confinement

Petitioner asks to the Court to order Respondent to release him to home incarceration, contending that his continued detention at the BFDF "will place him at grave risk of death from a highly contagious disease" and thus "violates [his] Fifth Amendment right to reasonably safe conditions of confinement." (Dkt. 122-1 at 7). Respondent opposes Petitioner's request, arguing that the BFDF has taken reasonable measures to protect Petitioner's health and safety and has thus not violated his constitutional rights. (Dkt. 140).

### A.    Legal Standard and Scope of Review

As a threshold matter, the Court considers the legal standard it must apply to Petitioner's motion. Petitioner does not directly address this issue, focusing instead on the Court's authority to order release to home incarceration under 8 U.S.C. § 1226a. (Dkt. 122-1 at 30-31). Respondent argues that the Court should treat the motion as one for a preliminary injunction setting bail in a habeas case, and apply the associated standards. (Dkt. 140 at 20).

The Court notes initially that it has concerns regarding the propriety of raising an entirely new conditions-of-confinement claim by motion. It is true that both the D.C. Circuit and the Second Circuit have held that a challenge to conditions of confinement may be brought in a habeas proceeding.[2] *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir.

---

[2]    As the Court has previously explained, Petitioner's habeas claim under 28 U.S.C. § 2241 is governed by Second Circuit law, while his claim under 8 U.S.C. § 1226a(b) is

2014) ("[O]ne in custody may challenge the conditions of his confinement in a petition for habeas corpus."); *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as the administration of parole, prison disciplinary actions, prison transfers, type of detention and prison conditions." (quotation and alteration omitted)). *But see Wilborn v. Mansukhani*, 795 F. App'x 157, 163 (4th Cir. 2019) ("Seven of the ten circuits that have addressed the issue in a published decision have concluded that claims challenging the conditions of confinement cannot be brought in a habeas petition."). However, courts typically do not entertain motions in habeas cases that reach issues beyond those raised in the petition. *See Alonso Barrientos v. Barr*, No. 19-CV-6198-FPG, 2019 WL 3497055, at *1 (W.D.N.Y. Aug. 1, 2019). Nonetheless, because Respondent has not pressed this argument,[3] and in light of the exigent circumstances, the Court will excuse any procedural error and consider the merits of Petitioner's request.

The Court agrees with Respondent that the instant motion is analogous to a request for bail pending the resolution of a habeas petition and should be assessed under the standard applicable to such a request. As the Second Circuit explained in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), district courts have the limited authority to grant bail to habeas

---

governed by D.C. Circuit law. The parties have primarily cited Second Circuit law in their respective briefs, and the Court has done so throughout the remainder of this Decision and Order, but the result is the same under D.C. Circuit law.

[3]     Respondent has raised the issue in a footnote. (Dkt. 140 at 20 n.2). However, as Respondent acknowledges elsewhere in his response, "arguments made only in footnotes need not be considered by the Court." (*Id.* at 17 (alteration and quotation omitted)).

petitioners in "special cases." *Id.* at 226. The Court is unaware of any authority, and Petitioner cites none, suggesting that the Court has a broader authority to order home detention. To the contrary, Petitioner cites to *Mapp* in arguing that "[a]ll of the relevant factors here . . . militate in favor" of his requested relief. (Dkt. 122-1 at 35). As such, the Court will apply the *Mapp* standard here.

> As one court in this Circuit recently explained:
>
> Courts consider three factors in determining whether the *Mapp* standard is met: (1) whether substantial claims are set forth in the habeas corpus petition; (2) whether the petitioner has demonstrated a likelihood of success on the merits of his or her petition; and (3) whether there are extraordinary circumstances attending the petitioner's situation which would require release on bail in order to make the writ of habeas corpus effective.

*Arana v. Barr*, No. 19 CIV. 7924 (PGG), 2020 WL 1659713, at *3 (S.D.N.Y. Apr. 3, 2020) (quotation omitted). For purposes of the instant Decision and Order, the Court will assume that the COVID-19 pandemic, considered in combination with Petitioner's underlying health issues, satisfies the third *Mapp* factor. *See, e.g.*, *Jovel v. Decker*, No. 20-CIV-308 (GBD) (SN), 2020 WL 1467397, at *1 (S.D.N.Y. Mar. 26, 2020) ("[I]n light of the considerable—and growing—concern surrounding the COVID-19 health crisis, . . . as well as Petitioner's separate personal medical issues, this Court finds that Petitioner has adequately demonstrated extraordinary circumstances requiring his release."). Accordingly, the determinative questions are whether Petitioner's conditions-of-confinement claim is substantial and whether he is likely to succeed on it. The Court considers those questions below.

The Court further agrees with Respondent that absent an underlying constitutional violation, it lacks the authority to interfere with the Department of Homeland Security's decisions regarding the location of Petitioner's detention. Even accepting Petitioner's argument that the text of 8 U.S.C. § 1226a allows for home detention (*see* Dkt. 122-1 at 27-29), the Immigration and Nationality Act (the "INA") delegates to the Secretary of Homeland Security the responsibility to "arrange for appropriate places of detention for aliens detained pending removal. . . ." 8 U.S.C. § 1231(g)(1); *see also* 6 U.S.C. §§ 251(2), 557 (transferring immigration functions from Department of Justice to Department of Homeland Security). The INA further prohibits courts from reviewing "any . . . decision or action" the authority for which is specified therein to be in the "discretion" of the Secretary of Homeland Security. 8 U.S.C. § 1252(a)(2)(B)(ii). This prohibition exists notwithstanding "section 2241 of Title 28, or any other habeas corpus provision." *Id.* The Second Circuit has characterized the decision of where to house an immigration detainee under § 1231(g) as discretionary. *See Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006). Accordingly, absent a constitutional violation that the Court has the inherent authority to remedy, the Court lacks the authority to review the Secretary of Homeland Security's decisions regarding the place in which Petitioner is detained.

**B.    The Merits of Petitioner's Conditions-of-Confinement Claim**

As previously noted, Petitioner claims that he is being held in unsafe conditions, violating his Fifth Amendment right to due process. "Immigration detainees can establish a due process violation for unconstitutional conditions of confinement by showing that a government official 'knew, or should have known' of a condition that 'posed an excessive

risk to health,' and failed to take appropriate action." *Basank v. Decker*, __ F. Supp. 3d __, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)); *see also Coronel v. Decker*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) ("The Due Process Clause . . . prohibits the federal government from being deliberately indifferent to the medical needs of civil detainees.").

Here, the Court does not doubt that the risk COVID-19 poses to Petitioner's health is serious. However, Respondent argues, and the Court agrees, that Petitioner has not raised a substantial claim that Respondent has exhibited deliberate indifference to this risk. Instead, the record establishes that Respondent has taken substantial, aggressive action to mitigate the risk. The fact that Respondent has not been able to eliminate the risk entirely does not establish deliberate indifference—to the contrary, despite unprecedented efforts by all levels of government, the public as a whole remains at risk of contracting COVID-19.[4] This includes not only residents in nursing homes and long-term care facilities, as well as patients in hospitals, all of whom have challenges similar to those faced by detention and correctional facilities, but also the general public.

---

[4] Indeed, as Respondent points out, the ongoing spread of COVID-19 in the community means that Petitioner would run a significant risk of infection were he permitted to travel by car to Florida to reside with his sister, as he requests. The Court notes that Petitioner's sister resides in Sunrise, Florida, which is within Broward County. As of April 9, 2020, at 5:00 p.m., the Florida Department of Health reported 2,480 cases of COVID-19 in Broward County. *Coronavirus: Summary of Persons Being Monitored, Persons Under Investigation, and Cases*, Fla. Dep't of Health, Division of Disease Control & Health Protection (Apr. 9, 2020), https://floridahealthcovid19.gov/#latest-stats.

There is no basis in the record before the Court to find deliberate indifference by Respondent. As the *Coronel* court explained:

> [A] petitioner establishes a claim for deliberate indifference by proving that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

2020 WL 1487274, at *4 (quotation and original alteration omitted). Neither of these standards is met here. First, it is beyond dispute that Respondent bears no responsibility for the outbreak of COVID-19, nor has Petitioner made any such suggestion.

Second, Respondent and the other staff at the BFDF have taken substantial, reasonable steps to mitigate the risk to Petitioner. As discussed above, the population at the BFDF has been reduced so that it is operating at just over half-capacity. All staff and visitors are being screened for a high temperature before entering the grounds. Medical personnel are required to wear face shields, face masks, gloves, and gowns when interacting with detainees. Other facility employees are wearing face masks and gloves and maintaining the appropriate distance from all detainees. Respondent has offered to provide Petitioner with an N95 mask should he wish to wear one.

Petitioner's individual circumstances are particularly well-suited to avoiding infection. He is housed in a single-occupant cell with his own toilet, sink, and shower, as well as his own supply of soap and shampoo. He has access to cleaning supplies and disinfectant to clean any shared surfaces prior to touching them. He has a tablet that has been assigned to him. Further, while there are COVID-19 infected patients on the same

floor as Petitioner, their cells are located a minimum of 50 feet from Petitioner's cell, which is well in excess of the recommended distance to avoid spreading infection. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention (Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (explaining that COVID-19 spreads "[b]etween people who are in close contact with one another (within about 6 feet)" and that "[m]aintaining good social distance (about 6 feet) is very important in preventing the spread of COVID-19").

The Court is not persuaded to the contrary by the declaration submitted by Petitioner's counsel on April 9, 2020. As an initial matter, the Court notes that declaration consists almost entirely of hearsay, which while sometimes admissible in habeas proceedings, is inherently less reliable than statements made on personal knowledge. Further, counsel's declaration is internally inconsistent and rife with speculation. Counsel states that the COVID-19 patients are housed "a couple dozen feet away" from Petitioner, but then claims only a few paragraphs later that they are "mere steps away." (Dkt. 149 at ¶¶ 10, 13). Counsel also speculates, with no factual basis that the Court can determine, that the medical personnel treating Petitioner may not have changed their PPE after treating the COVID-19 patients and that "the virus may be spreading in the air." (*Id.* at ¶¶ 6, 14). It is unfortunate that Petitioner is now suffering from a gastrointestinal illness, and the Court does have some questions regarding why the COVID-19 patients have seemingly been moved closer to Petitioner's cell—now being 50 feet away when on April 8, 2020, Captain Montalvo reported that they were 150 feet away—and the extent of their access to

shared areas and items. However, the Court does not find these outstanding questions sufficient to render Petitioner's due process claim substantial in light of the active mitigation efforts in place at the BFDF.

The steps taken by the BFDF distinguish this case from others in which courts have ordered the release of immigration detainees based on the risk of COVID-19 infection. In *Basank*, the respondents "could not represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another." 2020 WL 1481503, at *5. Similarly, in *Arana*, the petitioners were not able to follow "the recommended social distancing measures recommended by the CDC." 2020 WL 1659713, at *4 (quotation omitted). In this case, the record demonstrates that Petitioner is fully able to remain six feet from any other detainees and thus can follow the CDC's social distancing guidelines.

The situation in *Coronel* was even more egregious. There, the court explained that:

> [T]he record contain[ed] no evidence that the Government took any specific action to prevent the spread of COVID-19 to high-risk individuals, like the Petitioners, currently being held in civil detention. It has not isolated these high-risk individuals. It has not created special safety or hygiene protocols for them or for staff interacting with them to follow. It has not implemented a protocol to test individuals coming into jails or individuals who are in jails, either for COVID-19 itself or even for a high fever.

2020 WL 1487274, at *5. By contrast, in this case, Petitioner has been isolated from other detainees, he has his own sink, toilet, and shower, he has continual access to cleaning supplies and disinfectant sprays, and the BFDF has implemented a protocol to screen all individuals entering the facility for a high fever. Further, staff at the BFDF are wearing PPE and maintaining distance from detainees.

*Jones v. Wolf*, No. 20-CV-361, 2020 WL 1643857 (W.D.N.Y. Apr. 2, 2020), a case before another judge in this District involving detainees at the BFDF, also is not analogous. In *Jones*, United States District Judge Lawrence J. Vilardo granted in part a motion for a temporary restraining order. *Id.* at *1. In particular, Judge Vilardo found that the respondents in that case, who are high-risk individuals housed in the general population at the BFDF and who "eat communally, use shared restrooms, and are housed in either shared cells or in dorm-style housing," were not able to adopt "the 'social distancing' measures recommended—especially for high-risk individuals—by the CDC, the New York State Department of Health, and the petitioners' experts, to name a few." *Id.* at *8, *10. Accordingly, Judge Vilardo concluded that the respondents had acted with deliberate indifference by requiring the petitioners to reside in a "congregate, communal-living setting where social distancing is an oxymoron." *Id.* at *12 (quotation omitted). Judge Vilardo ordered the *Jones* respondents to take further action to facilitate social distancing for the petitioners and to provide additional information regarding their actions to the court, so that he could "decide whether the constitutional violation has been remedied and whether further action of the Court is required." *Id.* at *15.

Petitioner is not similarly situated to the petitioners in *Jones*. He is not housed in the general population at the BFDF, and is not subject to the same congregate, communal living situation. Further, the Court notes that Judge Vilardo did not immediately order the release, on conditions or otherwise, of the *Jones* petitioners. Instead, he afforded the respondents the opportunity to rectify the constitutional violation. Judge Vilardo subsequently issued an Order on April 9, 2020, in which he concluded that the respondents

had "remedied the previously-identified Due Process violation" as to several petitioners by placing them in single-occupancy cells, allowing them to eat in their cells and shower in isolation, providing disinfectant, masks, and ample soap, and requiring BFDF staff to wear masks when interacting with them. *Jones v. Wolf*, No. 20-CV-361, Dkt. 71 at 7-8 (W.D.N.Y. Apr. 9, 2020). As discussed at length above, comparable precautions have been taken with respect to Petitioner, and so *Jones* provides no support for his position.

The expert declarations submitted by Petitioner do not change the Court's conclusion. The declaration of Dr. Robert Greifinger, while providing information regarding the general risk of COVID-19 in correctional and detention facilities, does not relate to Petitioner or the particular conditions at the BFDF, addressing instead an ICE detention facility in Tacoma, Washington. (Dkt. 122-3). Indeed, in some ways Dr. Greifinger's declaration militates against Petitioner's request, as Dr. Greifinger states that "[s]ocial distancing and hand hygiene," both of which are being employed at the BFDF, are "the only known ways to prevent the rapid spread of COVID-19." (*Id.* at ¶ 8).

By contrast, the supplemental declaration of Dr. Jaimie Meyer (Dkt. 129) does specifically address Petitioner and the conditions at the BFDF. Dr. Meyer opines that the BFDF is "not able to adequately protect [Petitioner] from COVID-19 infection and he remains at imminent risk of harm." (*Id.* at ¶ 18). However, Dr. Meyer's opinion is based on incomplete or inaccurate information regarding the conditions at the BFDF. For example, Dr. Meyer states that there is no information regarding whether healthcare workers entering the BFDF are being screened or whether Petitioner has adequate access to soap for handwashing. (*Id.* at ¶¶ 11, 13). However, those questions are answered (in

the affirmative) by Respondent's most recent submissions. Further, Dr. Meyer assumed that Petitioner did not have access to disinfectant to clean common use surfaces, and expressly relied on that assumption when concluding that Petitioner was inadequately protected. (*Id*. at ¶¶ 10, 18). As discussed above, this assumption was incorrect, as Respondent's opposition make it clear that Petitioner has continual access to cleaning supplies and disinfectant sprays. Dr. Meyer also did not have knowledge about the PPE protocols now in place the BFDF. For these reasons, the Court does not find Dr. Meyer's supplemental declaration persuasive.

The Court does not take lightly the threat caused to Petitioner by COVID-19. As Judge Vilardo observed in *Jones*, "this Court is not aware of any other disease that caused New York State—let alone most of the nation—to decide that the only reasonable course of action was to shutter the economy, shelter in place, and isolate at home for weeks on end." 2020 WL 1643857, at *12. The Court further recognizes that Petitioner's personal health circumstances put him at increased risk of serious illness. However, the record before the Court demonstrates that Respondent has taken substantial, reasonable steps to prevent the spread of COVID-19 to Petitioner. While the risk to Petitioner has not been, and indeed could not be, eliminated entirely, Petitioner has not demonstrated deliberate indifference thereto. On these facts, the Court cannot order Respondent to release Petitioner to home incarceration.

While the Court finds no substantial claim of a due process violation at this time, the Court is aware that the situation on the ground is rapidly evolving and that future developments could necessitate revisiting this conclusion. To that end, the Court orders

Respondent to provide it with an update by no later than 5:00 p.m. on April 17, 2020, as to: (1) the number of confirmed COVID-19 cases in the BFDF; (2) the proximity of the COVID-19 patients to Petitioner's cell; (3) whether and how COVID-19 patients are being moved within the facility; (4) what access the COVID-19 patients have to shared areas and items; and (5) any additional protocols that have been put in place to halt the spread of COVID-19 or any alterations to existing protocols. The submission <u>must</u> be in the form of a sworn declaration by an individual with <u>direct</u> personal knowledge.

## II.  <u>Respondent's Motion to Adjourn the Evidentiary Hearing</u>

Having determined for the reasons set forth above that Petitioner is not entitled to release from detention at this point in time, the Court turns to the timing of the evidentiary hearing. Although Petitioner opposes the request to adjourn, he does not do so on the basis that it would be safe to go forward with the hearing at this time—to the contrary, Petitioner states that he "does not fault the government for seeking to delay an in-person hearing," acknowledging that such a hearing has the potential to "create a medical or public health risk for counsel, witnesses, court personnel, or their families and communities." (Dkt. 122-1 at 7). Instead, Petitioner argues that it is fundamentally unfair to postpone the hearing while he continues to be incarcerated, thus "leav[ing] him in detention . . . while the virus washes over our country, peaks, and finally subsides." (*Id*. at 7-8). In other words, the crux of Petitioner's opposition is that he should not have to wait any longer for an evidentiary hearing, because it is a necessary step towards resolution of his petition and his potential eventual release.

The Court has broad discretion to set a schedule in civil matters, and the constitutional and statutory right to a "speedy trial" applies only in criminal cases. *See Doherty v. Thornburgh*, 750 F. Supp. 131, 136 (S.D.N.Y. 1990), *aff'd*, 943 F.2d 204 (2d Cir. 1991) (explaining that neither the Sixth Amendment right to a speedy trial nor the Speedy Trial Act applied in habeas case brought by immigration detainee). While Petitioner undoubtedly has an interest in the swift resolution of his Petition, and while the Court has made every effort to move the instant action forward expeditiously since its inception approximately one year ago, the Court cannot permit Petitioner's desire for a final determination to endanger the health and safety of the parties, counsel, witnesses, court staff, and Petitioner himself.

The Court notes in this regard that while this action has lasted a year thus far, significant portions of the delay are equally attributable to actions by Petitioner as to any outside force. The Court entered a scheduling order on March 22, 2019 (one week after the action was filed on March 19, 2019) requiring Respondent to file his answer to the Petition within 45 days and Petitioner to reply 25 days thereafter. (Dkt. 6). However, the parties then jointly moved to amend that scheduling order, pushing the completion of briefing to July 26, 2019. (Dkt. 8). Then, on July 10, 2019, Petitioner requested an extension to August 9, 2019, to file his reply, which the Court granted. (Dkt. 23; Dkt. 24). The parties thereafter filed a consent motion for supplemental briefing on August 12, 2019, extending the briefing schedule until October 15, 2019. (Dkt. 26; Dkt. 27). The Court scheduled oral argument for November 13, 2019, but thereafter moved the oral argument to November 22, 2019, in response to a request from Respondent. (Dkt. 37; Dkt. 40). The

Court then issued its Decision and Order finding that an evidentiary hearing was necessary on December 13, 2019, only three weeks after oral argument. (Dkt. 55).

At a telephonic status conference on January 20, 2020, the Court asked Petitioner's counsel what Petitioner was "hoping for in terms of a schedule," but Petitioner's counsel indicated that Petitioner wanted to conduct discovery before conducting or even committing to a schedule for the evidentiary hearing. (Dkt. 68 at 5-7). In other words, it was Petitioner who requested pre-hearing discovery, which was what in turn necessitated scheduling the evidentiary hearing for late April. While Petitioner of course could not have possibly anticipated the COVID-19 outbreak and the havoc it has wreaked throughout the world, including in this community, the Court is not persuaded, on this record, that an adjournment of the evidentiary hearing for a short period of time as a matter of public safety is unfair to Petitioner.[5]

The Court further finds that it would be extremely reckless—and indeed a fundamental violation of this Court's duties—to go forward with an evidentiary hearing on April 28, 2020, given the current pandemic. As Respondent correctly notes in his papers, the evidentiary hearing would be "a large public gathering necessitating travel, which is precisely the type of event that federal, state, and local agencies have warned against for public health reasons." (Dkt. 120-1 at 9). To conduct an in-person evidentiary hearing in

---

[5]     The Court notes that even if the hearing went forward on April 28th, the Amended Petition would not likely be resolved at that time. The Court anticipates that post-hearing briefing will be required, and the Court will require adequate time after the completion of briefing to consider the complex legal and factual issues presented by this matter.

this matter would likely result in more than 30 people being present in the courtroom, taking into account court staff, the parties and their numerous respective counsel,[6] law enforcement personnel assigned to Petitioner and other detained witnesses, the witnesses themselves, and interested members of the media or the public.  It is untenable to think that social distancing could be maintained under these conditions.  The Court further notes that it granted Petitioner's request that the evidentiary hearing be held at the Buffalo Courthouse specifically to safeguard the public's right of access (*see* Dkt. 75 at 20-21), and that it would be unreasonable to expect the public or reporters to risk their health in the middle of a global pandemic to attend an in-person hearing.

Additionally, the purpose of the evidentiary hearing is to aid the Court in making factual determinations in connection with resolving Petitioner's claims.  However, the travel restrictions in place at this time, combined with the other effects of the ongoing pandemic, make it unlikely that all witnesses will be able to attend, including one of Respondent's witnesses who is located in Egypt.  It would be counterproductive to hold an evidentiary hearing when the parties would be hamstrung in presenting their respective cases.  In fact, just as an example of the challenges presented by going forward in the current climate, the hotel where the Court and its staff planned to stay during the hearing has temporarily closed and the reservations have been cancelled.

Finally, the Court has considered whether the evidentiary hearing could be conducted in a virtual format, such as by video or telephone conference and, at least at this

---

[6]     The docket alone lists a total of 13 counsel for the parties.

time, it has concluded that it cannot.  The number of people involved makes such a proposition unwieldy at best, as the Court has already experienced when holding telephonic appearances in this matter.  Further, the factual disputes in this matter rest heavily, if not almost exclusively, on matters of credibility, and the Court finds that a virtual hearing would present significant challenges in being able to adequately perform the critical credibility assessments that this matter requires.  Depending on the future course of this pandemic, it may be that the Court in consultation with the parties will need to evaluate whether a hearing in a virtual format is an appropriate course of action, but it would be premature to reach that decision at this time.

For all these reasons, the Court finds that the evidentiary hearing must be adjourned, and the associated deadlines for submission of pre-hearing legal memoranda and exhibit and witness lists are held in abeyance.  However, the Court will not, as Respondent requests, set the hearing for four weeks after the Court lifts its courthouse access restrictions.  The situation presented by the COVID-19 pandemic changes rapidly, and neither the Court nor the parties are in a position at this point to know how long the pandemic will last or when an in-person appearance will be feasible.  The Court may ultimately determine, as the pandemic progresses and recommendations from the CDC and others evolve, that access restrictions and other accommodations will sufficiently mitigate the risk to allow an in-person hearing.  The Court is not in a position to make any final determinations in that regard at present.  Instead, the Court sets a telephonic status conference for May 1, 2020, at 11:00 a.m., to discuss rescheduling the evidentiary hearing.

## **CONCLUSION**

For the reasons set forth above, Respondent's motion to adjourn the evidentiary hearing (Dkt. 120) is granted in part. The evidentiary hearing scheduled for April 28, 2020, is adjourned without further date, and the associated deadlines for submission of pre-hearing legal memoranda and exhibit and witness lists are held in abeyance. A telephonic status conference to discuss scheduling is set for May 1, 2020, at 11:00 a.m. Call-in information will be provided to counsel.

Petitioner's motion for transfer to home incarceration (Dkt. 122) is denied. The Court orders Respondent to submit a sworn declaration from an individual with direct personal knowledge providing the informational updates specified above by no later 5:00 p.m. on April 17, 2020.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      April 10, 2020
              Rochester, New York