UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ADHAM AMIN HASSOUN,

               Petitioner,

       v.

JEFFREY SEARLS, in his official
capacity as Acting Assistant Field Office
Director and Administrator of the Buffalo
Federal Detention Facility,

             Respondent.

**DECISION AND ORDER**

1:19-CV-00370 EAW

---

## <u>INTRODUCTION</u>

Petitioner Adham Amin Hassoun ("Petitioner") is a civil immigration detainee currently housed at the Buffalo Federal Detention Facility (the "BFDF") in Batavia, New York. Respondent Jeffrey Searls ("Respondent") is administrator of the BFDF. Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and 8 U.S.C. § 1226a(b), arguing that his current detention is unauthorized by lawful statute or regulation and that he must be released, with appropriate conditions of supervision. Respondent contends that Petitioner is lawfully detained pursuant to both 8 U.S.C. § 1226a(a) and 8 C.F.R. § 241.14(d).

On December 13, 2019, the Court entered a Decision and Order (Dkt. 55) finding that Petitioner's continued detention is not lawfully authorized by 8 C.F.R. § 241.14(d) and that an evidentiary hearing is necessary in connection with Petitioner's challenge to the

- 1 -

lawfulness of his continued detention pursuant to 8 U.S.C. § 1226a. The legal and factual background of this action are set forth in detail in the Court's Decision and Order of December 13, 2019, familiarity with which is assumed for purposes of the instant Decision and Order.  The Court further assumes familiarity with its prior Decision and Order dated January 24, 2020, regarding the parameters of the evidentiary hearing.  (Dkt. 75).

The Court permitted the parties to engage in discovery in anticipation of the evidentiary hearing (Dkt. 57; Dkt. 58; Dkt. 70) and ordered that any discovery motions be filed by February 28, 2020 (Dkt. 70; Dkt. 71). On February 28, 2020, Petitioner filed a motion to compel and for a protective order (Dkt. 91), and Respondent filed a motion to defer consideration of any potential assertion of the state secrets privilege (Dkt. 90).

On March 16, 2020, Respondent filed a motion (Dkt. 104) to enforce the Protective Order entered by the Court on February 6, 2020 (Dkt. 77).  Also on March 16, 2020, oral argument on the pending discovery motions was held, and the Court resolved some issues from the bench and reserved decision on others.  (*See* Dkt. 113; Dkt. 114).  The Court further instructed the parties to attempt to resolve among themselves certain disputes related to Respondent's privilege logs.  (Dkt. 108).

On April 7, 2020, the Court found that there was "undisputed evidence that Petitioner violated the Protective Order" but denied Respondent's motion to enforce the Protective Order as moot without prejudice to any future motion by Respondent seeking other relief.  (Dkt. 138).

On April 30, 2020, Respondent filed a motion for sanctions related to Petitioner's breach of the Protective Order.  (Dkt. 154).  Petitioner filed a cross-motion to compel disclosure and for sanctions on May 15, 2020.  (Dkt. 164).

The evidentiary hearing is scheduled to commence on June 24, 2020.  (Dkt. 158).  Pursuant to an Order of the Court (*see id.*), Respondent submitted a pre-hearing memorandum containing a request to present hearsay statements from five individuals at the evidentiary hearing (Dkt. 169).  Petitioner objects to four out of five of Respondent's requests.  (Dkt. 199).

On June 8, 2020, Petitioner filed motions to amend his exhibit list (Dkt. 201) and to file supplemental objections to Respondent's requests to admit hearsay evidence (Dkt. 202).  On June 11, 2020, Respondent filed a Notice (Dkt. 207) informing the Court that on June 5, 2020, the Federal Bureau of Investigation ("FBI") issued a "letterhead memorandum" to Acting Secretary of Homeland Security Chad F. Wolf  in connection with the periodic review of Petitioner's continuing detention required by 8 C.F.R. § 241.14 and 8 U.S.C. § 1226a.  Respondent filed a motion on June 12, 2020, to amend his witness and exhibit lists based on information found in the FBI's letterhead memorandum of June 5, 2020.  (Dkt. 209 (sealed version); Dkt. 219 (redacted version)).

The Court conducted a pre-hearing conference and heard oral argument on the parties' sanctions motions and the additional outstanding pre-hearing issues on June 12, 2020.  (Dkt. 218).  The Court issued oral rulings on several outstanding issues and reserved decision on the others.  (*Id.*).  The Court issued a Text Order on June 12, 2020, resolving

Petitioner's motion to amend his exhibit list and to file supplemental objections to Respondent's pre-hearing memorandum, to which Respondent had not objected.  (Dkt. 211).  On June 15, 2020, the Court entered a further Text Order stating that it would admit hearsay evidence related to Ahmed Hamed and granting in part and denying in part Respondent's motion to amend his witness and exhibit lists.  (Dkt. 216).

This Decision and Order sets forth the reasons for the Court's prior rulings and resolves the majority of the outstanding issues.  However, for reasons discussed below and stated on the record on June 12, 2020, the Court reserves decision on Petitioner's request for sanctions and additional discovery related to Respondent's alleged litigation misconduct.

## DISCUSSION

### I.   Nature of the Proceeding

As a threshold matter, the Court sets forth the basis for its ruling, made from the bench on March 16, 2020, that "[t]his is not a criminal proceeding.  And it's not a quasi-criminal proceeding. . . .  It's a civil habeas corpus proceeding."  (Dkt. 114 at 7).

Many of Petitioner's arguments in this case have been premised on his contention that this proceeding is "quasi-criminal" and that he is accordingly entitled to the protections afforded to criminal defendants.  The Court previously rejected the argument that Petitioner is entitled to the same protections afforded to criminal defendants, specifically with respect to the Sixth Amendment right to confrontation.  (*See* Dkt. 75 at 14-15).  The Court expands on that determination below.

Despite Petitioner's arguments to the contrary, it is well-established that "[a] petition for a writ of habeas corpus is a civil proceeding."  *In re Guantanamo Bay Detainee Litig.*, 630 F. Supp. 2d 1, 9 (D.D.C. 2009); *see also Dhiab v. Trump*, 852 F.3d 1087, 1092 n.8 (D.C. Cir. 2017) ("[T]he writ of habeas corpus is a civil remedy for the enforcement of the right to personal liberty not a stage of a criminal proceeding." (quotations omitted)); *Goldsmith v. Valentine*, 36 App. D.C. 63, 66 (D.C. Cir. 1910) ("It is well settled that habeas corpus is a civil, and not a criminal, proceeding. . . ."); *Sarno v. U.S. Dep't of Justice*, 278 F. Supp. 3d 112, 125 (D.D.C. 2017) ("Habeas petitions are civil proceedings . . . which allow an individual to challenge his detention on the grounds that it occurs in violation of his constitutional rights.").  Petitioner's argument that he faces potentially indefinite detention does not, standing alone, warrant a departure from this well-established law. Habeas proceedings by their very nature frequently implicate weighty liberty interests. Nonetheless, "such proceedings are not subject to all the protections given to defendants in criminal prosecutions."  *Al Alwi v. Obama*, 653 F.3d 11, 19 (D.C. Cir. 2011) (quotation omitted).

Petitioner has not cited a single case in which a habeas court has accepted the argument that the proceeding is "quasi-criminal" and applied the full panoply of protections afforded to criminal defendants.  Petitioner does cite the Supreme Court's decision in *In re Gault*, 387 U.S. 1 (1968), which found that juvenile delinquency hearings "which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination."  *Id.* at 49.  Petitioner's reliance on *In*

*re Gault* is misplaced.  As an initial matter, *In re Gault* dealt not with the procedure to be used in the habeas proceeding itself, but with the procedures in the underlying adjudication. Further, as Petitioner acknowledges, the Supreme Court subsequently declined to extend *In re Gault* to the civil commitment context, stating that "involuntary commitment does not itself trigger the entire range of criminal procedural protections."  *Allen v. Illinois*, 478 U.S. 364, 372 (1986).  *In re Gault* does not support the conclusion that these proceedings should be treated as "quasi-criminal" or that Petitioner is entitled to the constitutional protections given to criminal defendants.  The Court has already performed an in-depth analysis of the process that is due to Plaintiff under these circumstances, taking into account the significant liberty interest at stake and the countervailing concerns of national security, as well as longstanding case law regarding involuntary confinement in the civil context. (*See* Dkt. 75).

The Court further notes it is well-established that "the scope and extent" of any discovery in a habeas proceeding "is a matter confided to the discretion of the District Court." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997).  While the Court has determined that some discovery is warranted in this case, that does not mean that Petitioner is entitled to the scope of discovery to which a criminal defendant, or even an ordinary civil litigant, would be entitled.  *See id.* at 904 ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.").  Instead, the Court's determination as to the scope of discovery has been guided by the limited purpose for which it has ordered an evidentiary hearing.

## II.    Discized Motions

### A.    Petitioner's Motion

Having clarified the nature of this proceeding, the Court turns to the pending motions, beginning with Petitioner's motion to compel and for a protective order.  (Dkt. 91).  Petitioner's motion raises three issues: (1) Petitioner seeks the identities of all confidential informants whose statements Respondent claims justify Petitioner's ongoing detention and additional information regarding all confidential informants who have provided the government with information regarding Petitioner, regardless of whether such information will be relied upon by Respondent; (2) Petitioner argues that Respondent has failed to properly invoke the law enforcement investigatory files privilege; and (3) Petitioner argues that Respondent cannot call him as a witness and compel him to testify. The Court considers each of these arguments in turn.

### 1.    Identities of Confidential Informants

The Court has already ruled on the applicability of the confidential informant privilege in this context (*see* Dkt. 75 at 17-18) and will not repeat its analysis here; instead, the Court will adhere to its prior conclusion that Respondent is not categorically required to identify any confidential informants and that Petitioner bears a "heavy burden" in establishing that disclosure of an informant's identity is warranted (*id*. (citing *United States v. Mangum*, 100 F.3d 164, 172 (D.C. Cir. 1996))).  The Court further reiterates that the confidential informant privilege applies with even more force in civil litigation than in criminal litigation.  (*Id*. at 18).

Against this backdrop, the Court ruled from the bench on March 16, 2020, that it would not order Respondent to identify any confidential informants on whose testimony he would not be relying at the evidentiary hearing. (*See* Dkt. 114 at 5-6). The Court rejects any argument that Respondent should be required to provide the identities of confidential informants on whose testimony he will <u>not</u> rely to justify Petitioner's continued detention. A party seeking to overcome the confidential informant privilege must make a non-speculative showing "that the informer was an actual participant in or a witness to the offense charged, whose identity is necessary to the defense." *Mangum*, 100 F.3d at 172 (quotations and alteration omitted); *see also United States v. Gaston*, 357 F.3d 77, 85 (D.C. Cir. 2004) ("It was incumbent upon [the defendant] to shoulder the heavy burden of showing why the informant's testimony was necessary to her defense at trial." (quotations omitted)). The D.C. Circuit's decision in *United States v. Warren*, 42 F.3d 647 (D.C. Cir. 1994), is instructive. There, the confidential informant at issue provided information about a controlled drug buy that was used to support a search warrant, but he was not a participant or eyewitness to the crimes charged, which were based entirely on evidence recovered from execution of the search warrant. *Id*. at 654. In other words, while the confidential informant's information led to the discovery of evidence that would be used against the defendant, he was not an actual participant in or a witness to the offense charged, and therefore the D.C. Circuit upheld the district court's determination that the defendant was not entitled to disclosure of the informant's identity. *Id*. While disclosure may have been

helpful to the defense, that was not enough to satisfy the burden for disclosure of the witness' identity.  *Id.* at 654-55.

Analogizing to this case, the "charges" against Petitioner are the incidents and actions that Respondent maintains demonstrate his dangerousness.  Respondent will be required to offer evidence, either in the form of testimony or admissible hearsay, regarding those incidents and actions.  However, with respect to informants who reported only incidents on which Respondent does not rely to prove ongoing danger but rather may have possibly led to the discovery of relevant evidence, such informants are the equivalent of the informant in *Warren* who witnessed a controlled drug buy leading to issuance of a search warrant, and the Court cannot conclude that their identities are necessary to Petitioner where Respondent does not intend to rely upon their observations to justify Petitioner's detention.  *Cf. Dokhan v. Obama*, 599 F. Supp. 2d 18, 20-21 (D.D.C. 2009) (ordering discovery solely as to the petitioner's own statements and "documents and objects in the government's possession that the government relies on to justify detention," and placing the burden of justifying any further discovery on the petitioner).   For the same reason, the Court rejects Petitioner's argument that Respondent should be required to provide a pseudonymous list of confidential informants on whose statements he has not and will not rely to justify Petitioner's detention.

Respondent confirmed at oral argument on June 12, 2020, that he did not intend to present any hearsay evidence from unnamed confidential witnesses at the evidentiary

hearing. Accordingly, to the extent Petitioner seeks additional information about confidential informants, his motion is denied.

### 2.      Assertion of Law Enforcement Investigatory Files Privilege

Petitioner argues that Respondent has not properly invoked the law enforcement investigatory files privilege (the "IV privilege") and should be compelled to produce updated privilege logs containing additional information. As a threshold matter, Petitioner argues that the IV privilege does not apply to this "quasi-criminal proceeding," citing criminal cases including *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). (Dkt. 101 at 21-22). This argument is disposed of by the Court's prior discussion regarding the nature of this proceeding. *Brady*, *Giglio*, and their progeny do not govern in this civil matter, and Respondent may invoke the IV privilege if it applies.

The parties further disagree regarding the law applicable to the adequacy of the Respondent's invocation of the IV privilege, as set forth in his privilege logs. As the Court has previously acknowledged (*see* Dkt. 75 at 6 n.2), 8 U.S.C. § 1226a(b)(4) provides that "[t]he law applied by the Supreme Court and the United States Court of Appeals for the District of Columbia Circuit shall be regarded as the rule of decision in habeas corpus proceedings [held pursuant to § 1226a]." Respondent contends that the phrase "the rule of decision" applies only to the substantive law of the D.C. Circuit, and that the Court should apply Second Circuit law as to procedural matters such as the form and adequacy of a privilege log. Petitioner disagrees, arguing that "Congress enacted 8 U.S.C. § 1226a(b)(3)

to avoid circuit splits of the type that would be created if this Court were to apply Second Circuit law to determine whether a claim of privilege is properly invoked."  (Dkt. 101 at 22 n.9).  Petitioner argues in the alternative that the Court need not resolve this issue, because "the government's privilege logs are deficient under Second Circuit law as well." (*Id.*).

As stated on the record on March 16, 2020, the Court agrees with Respondent that 8 U.S.C. § 1226a(b)(4) does not require the Court to apply D.C. Circuit procedural law. Congress specifically used the phrase "rule of decision" in drafting § 1226a(b)(3), and the "rule of decision" is distinct from procedural rules.  *See, e.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (explaining that a rule is procedural if it "governs only the manner and the means by which the litigants' rights are enforced" and is substantive if it affects "the rules of decision by which the court will adjudicate those rights" (quotations and alterations omitted)).  While D.C. Circuit law governs the scope and applicability of the IV privilege in this case, rules governing the manner in which the privilege must be invoked are procedural rules and not "rules of decision."  *See In re Sealed Case*, 856 F.2d 268, 272 n.3 (D.C. Cir. 1988) (distinguishing the merits of a claim of privilege from the procedural steps that must be taken to properly invoke it); *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 405 n.11 (D.C. Cir. 1984) (describing requirement of a "formal claim of privilege by the head of the department with control over the information" as a "procedural requirement").  Accordingly, the Court rejects Petitioner's argument that it was necessary for the head of the department having

control over the requested information to make a formal invocation of the IV privilege based on his actual, personal consideration (as would be required under D.C. Circuit procedural rules). *Compare In re Sealed Case*, 856 F.2d at 272, *with In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010).

On March 16, 2020, the Court instructed the parties to engage in additional efforts to resolve any issues related to Respondent's invocation of the IV privilege in this case. The parties were thereafter able to narrow the dispute to four documents, which Respondent then provided to the Court for *in camera* review. (*See* Dkt. 139; Dkt. 161). The Court, having reviewed the disputed documents, finds that they fall within the scope the IV privilege and have properly been withheld by Respondent. The Court further finds that, in any event, none of the disputed documents contain information that is important to Petitioner's case and that they would have no impact or bearing on the Court's assessment of the merits of this matter. Accordingly, Petitioner's motion is denied with respect to his claims regarding the IV privilege.

The Court further notes that on March 17, 2020, it granted a motion by Respondent to submit a classified declaration regarding the IV privilege *ex parte* and in camera. (Dkt. 97; Dkt. 109). However, because the parties were able to narrow their dispute, the Court never reviewed the classified declaration and has not relied upon it in making any determinations in this matter.

### 3.   Respondent's Ability to Call Petitioner as a Witness

Petitioner argues that his Fifth Amendment right against self-incrimination prohibits Respondent from calling him as a witness at the evidentiary hearing, and he seeks a protective order to that effect.  On March 16, 2020, the Court ruled from the bench that Petitioner could not use the Fifth Amendment to avoid testifying entirely, nor could he invoke his Fifth Amendment privilege in a blanket manner.  (Dkt. 114 at 28-29).

There is no merit to Petitioner's argument that he, like a criminal defendant, has an absolute right not to testify in this matter.  Again, the Court has rejected Petitioner's argument that this matter is quasi-criminal, and has further rejected Petitioner's argument that *In re Gault* supports a finding of an absolute right not to testify in this case.  *See Latif v. Obama*, 666 F.3d 746, 759 (D.C. Cir. 2011) (finding absolute Fifth Amendment right against self-incrimination inapplicable in habeas context, because a "habeas petitioner is not entitled to the same constitutional safeguards as a criminal defendant").

Petitioner argues in the alternative that he should be permitted to make a "blanket assertion" of his privilege against self-incrimination.  The Fifth Amendment privilege against self-incrimination may be "asserted in any proceeding, civil or criminal" and "protects any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."  *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972) (footnote omitted).  "[T]here is a presumption against blanket assertions of Fifth Amendment privilege, and the law is clear that the privilege against self-incrimination must be asserted on a question-by-question basis."  *Dist. Title v.*

*Warren*, 265 F. Supp. 3d 17, 21-22 (D.D.C. 2017) (citation and quotation omitted); *see also United States v. Crews*, 856 F.3d 91, 98 (D.C. Cir. 2017) ("[B]lanket assertions of the privilege against self-incrimination are disfavored."). However, "in unusual cases a district judge may sustain a blanket assertion of the Fifth Amendment privilege after determining that there is a reasonable basis for believing a danger to the witness might exist in answering *any* relevant question." *United States v. Ortiz*, 82 F.3d 1066, 1073 (D.C. Cir. 1996) (quotation and alterations omitted).

The Court does not find that this is the unusual case in which a blanket assertion of the Fifth Amendment privilege is warranted. To the contrary, the Court can envision any number of potentially relevant questions that Petitioner could be asked that would not implicate any potential criminality. Further, Petitioner is represented by experienced, competent counsel, who will be available during the hearing to object to any potentially dangerous questions. Petitioner will, of course, be free to consult with counsel and invoke the privilege on a question-by-question basis.

Petitioner argues that in the event he does invoke his Fifth Amendment privilege, no adverse inference should be drawn from such invocation. The Court finds this argument premature. "While it is permissible to draw an adverse inference in a civil case from a witness's refusal to testify, in order to do so there must be independent evidence to support the negative inferences. . . ." *Alexander v. F.B.I.*, 691 F. Supp. 2d 182, 196 (D.D.C. 2010) (quotation omitted), *aff'd*, 456 F. App'x 1 (D.C. Cir. 2011). Here, the Court has no way of knowing at this stage of the proceedings whether or to what extent Petitioner will invoke

his Fifth Amendment privilege, nor what other evidence will come in that might support a negative inference.  The issue of any potential adverse inference is thus best addressed in post-hearing briefing.   The Court does reject, however, any suggestion that it is categorically prohibited from drawing an adverse inference based on any refusal to testify by Petitioner.  *See Latif*, 666 F.3d at 759 (rejecting argument that district court could not draw adverse inference based on habeas petitioner's refusal to testify on Fifth Amendment grounds).

### 4.    <u>Order of Witnesses</u>

At oral argument on March 16, 2020, after the Court announced its ruling as to Petitioner's Fifth Amendment arguments, Petitioner made an alternative request that the Court, pursuant to Federal Rule of Evidence 611(a), order Respondent to call Petitioner last, so that he could properly assess whether and to what extent to invoke his Fifth Amendment privilege.  (Dkt. 114 at 29-30).  Respondent opposed the request, and the Court reserved decision.  (*Id*. at 30-31).   The parties filed supplemental briefing on this issue on April 3, 2020.  (Dkt. 125; Dkt. 126).   At oral argument on June 12, 2020, the Court announced from the bench that it would grant Petitioner's request in this regard.

Pursuant to Rule 611(a), "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a).  The Court's

determinations as to the order of witnesses pursuant to Rule 611(a) are reviewed for abuse of discretion. *See United States v. Singh*, 811 F.2d 758, 763 (2d Cir. 1987).

Here, the Court determines in its discretion that if Respondent calls Petitioner as a witness at the evidentiary hearing, he must call him last. It is true that the Court's "ample discretion to control the order of interrogating witnesses. . . . should be used sparingly and good reason should exist before the court intervenes in what is essentially a matter of trial strategy." *United States v. Machor*, 879 F.2d 945, 954 (1st Cir. 1989) (citations omitted). However, the Court concludes that good reason exists here. The purpose of the evidentiary hearing is to test the factual basis for the government's determination that Petitioner must be detained, potentially for the rest of his life, because of the threat he poses to national security. None of the information underlying that determination was gleaned from Petitioner himself, and it would be inefficient and unhelpful to have him testify at the outset of the hearing before either he or the Court understand the scope of the allegations against him. Indeed, Petitioner's decision concerning the invocation of his Fifth Amendment rights may necessarily be informed by Petitioner's assessment of the strength of the government's case, and in fairness the Court believes he should be able to make that decision once fully apprised of the government's proof. Further, this is an evidentiary hearing and not a trial, so the Court has greater latitude in controlling the presentation of evidence. *See Goodwyn v. Simons*, 90 F. App'x 680, 682 (4th Cir. 2004) (rejecting argument that the district court erred in requiring the plaintiff to proceed first at an evidentiary hearing even though the defendant bore the burden of proof and noting that

"this hearing was before the district court judge alone, without a jury").  The Court is the ultimate factfinder in this case, and is fully capable of allocating the burden of proof consistent with its prior legal conclusions regardless of the order in which Respondent presents his evidence.

However, the Court rejects Petitioner's proposal that "his own counsel be allowed to conduct a direct examination, followed by a cross examination with the option to extend beyond the scope of direct examination, a re-direct by Petitioner, and a re-cross, if necessary."  (Dkt. 171 at 2).  Because Respondent bears the burden of proof in this case, he is entitled to examine Petitioner first on direct examination.  Petitioner's counsel can then cross-examine Petitioner and/or call Petitioner as a witness on direct examination during Petitioner's presentation of evidence.

**B.**      **Respondent's Motion to Defer Consideration of the State Secrets Privilege**

Respondent has filed a motion asking the Court to defer consideration of any potential invocation of the state secrets privilege until "21 days after the Court has reviewed and rejected all other privileges asserted and decided that the classified information at issue is relevant to the habeas claims in this case."  (Dkt. 90 at 1).  Petitioner opposes this motion, asking the Court to instead "order the government to promptly identify any responsive discovery that *may be* subject to the state secrets privilege, and that the Court review such information *in camera* to determine if any of it is relevant and helpful to Petitioner's case."  (Dkt. 99 at 2).

Respondent's request has been mooted by subsequent events in this case—namely, the fact that there are no documents or information as to which the Court has rejected all other asserted privileges. Accordingly, there is no need for Respondent to consider invoking the state secrets privilege, and his motion to defer his time in which to do so is denied as moot.

### III. Sanctions Motions

#### A. Respondent's Motion for Sanctions

The Court turns next to the parties' motions for sanctions, this time starting with Respondent's motion. (Dkt. 154; *see also* Dkt. 172 (redacted version of motion)). The factual underpinnings of Respondent's motion are set forth in the Court's Decision and Order dated April 7, 2020 (Dkt. 138), in which it denied as moot Respondent's motion to enforce the Protective Order. To summarize briefly, on February 14, 2020, Petitioner, in violation of the Protective Order, disclosed the identify of a confidential informant, Shane Ramsundar, to a religious gathering at the BFDF and called Ramsundar "a rat, a liar, and a coward." (*Id.* at 3). Ramsundar's name has subsequently been disclosed on the public docket in this case, and so the Court has not used a pseudonym in this Decision and Order.

Respondent initially requested several forms of relief based on Petitioner's violation of the Protective Order: (1) dismissal of the Petition; (2) that Ramsundar and other witnesses "who have expressed concerns with testifying due to Petitioner's intimidation" be permitted to submit sworn declarations in lieu of live testimony; (3) that the Court "impose an adverse evidentiary determination against Petitioner and presume that the

report from which Petitioner learned of Ramsundar's identity . . . is true"; and (4) in the event it declined to order any of the above remedies, that the Court sequester Petitioner from the courtroom during the testimony of other witnesses.  (Dkt. 172 at 14-22).  However, Respondent has now withdrawn his request for dismissal and for an adverse evidentiary determination, and requests only that the Court "permit[] witnesses to provide sworn declarations rather than live testimony, and, to the extent that the Court does not permit testimony by sworn declaration, sequester[] Petitioner from the courtroom during the testimony of other witnesses."  (Dkt. 180 at 2-3).  During oral argument on June 12, 2020, Respondent's counsel clarified that in addition to seeking to remove Petitioner from the courtroom during the testimony, they are seeking to prevent him from knowing the contents of the testimony.  (Dkt. 218 at 7-8).  As a practical matter, it is not clear how such an order would be enforced, where these witnesses will be testifying in a public proceeding and presumably the Court will be issuing a decision after the evidentiary hearing that may discuss the testimony of these witnesses.  Respondent's counsel has acknowledged that none of the lay witnesses who will testify were present during Petitioner's breach of the Protective Order on February 14, 2020—instead, they have allegedly expressed general concerns about testifying against Petitioner.

There is no question that Petitioner violated the Protective Order.  Further, the Court is not persuaded that Petitioner was not aware that revealing Ramsundar's name would violate the Protective Order.  (*See* Dkt. 191-1 at ¶ 6).  The Protective Order, which Petitioner was required to read before being granted access to any confidential information,

plainly states that it prohibits the disclosure of not only the documents but "the contents <u>or</u> <u>information</u> contained therein," including by summary or paraphrase.  (Dkt. 77 at 2 (emphasis added)).  Petitioner is an intelligent man with extensive experience with the judicial system, and the Court does not find it plausible that he did not understand that the names of confidential informants, revealed pursuant to a protective order, could not be disseminated.

However, while the Court takes Petitioner's violation of the Protective Order seriously, it will not issue a sanction that will impair its factfinding function.  "[A]lthough the decision to impose sanctions is uniquely within the province of a district court, . . . any such decision [must be] made with restraint and discretion."  *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999).  In this case, were the Court to grant Respondent's request that it allow witnesses to submit sworn declarations, regardless of the reliability thereof, it would be undercutting the purpose of the evidentiary hearing the Court has already found necessary.  The unique circumstances of this case require the Court to make factual determinations that may ultimately govern whether Petitioner remains in detention indefinitely, and the Court will not hinder its own ability to make accurate assessments as a sanction.

Further, Respondent has not established that sequestering Petitioner from the courtroom during witness testimony would either mitigate against any potential prejudice or deter future violations of the Protective Order.  While Respondent has submitted evidence that witnesses have expressed reluctance to testify against Petitioner, he has failed

to tie those fears to Petitioner's violation of the Protective Order—admittedly, the witnesses' proffered reluctance to testify has nothing to do with the incident on February 14, 2020.  To bar Petitioner from the courtroom where a factfinding determination will be made as to whether he should be indefinitely detained, and to prevent him from ever learning the nature of the testimony, is not only impractical, but it is not reasonably related to the violation of the Protective Order.  The violation of the Protective Order was serious, but any sanction must be proportional to the breach—and Respondent's requested relief is not.

To be clear for the record, in making the above determinations, the Court has given no credence to Ramsundar's allegation that Petitioner made a threat on his life after Ramsundar was revealed as a confidential informant in this matter.  The Court discusses this allegation in more detail in connection with its analysis of Petitioner's cross-motion for sanctions.

In sum, the Court finds that the sanctions requested by Respondent are not appropriate or warranted in this case.   The Court accordingly denies Respondent's motion for sanctions.  As indicated during the argument on June 12, 2020, Respondent is free to introduce evidence of Petitioner's violation of the Protective Order at the evidentiary hearing, in support of the contention that Petitioner presents a risk of danger if released.

## B.     Petitioner's Cross-Motion to Compel and for Sanctions

The Court next considers Petitioner's cross-motion to compel and for sanctions. (Dkt. 164).

Petitioner's motion to compel arises from Respondent's failure to produce in discovery information calling into question Ramsundar's credibility. (*See* Dkt. 190 at 6-7). Specifically, despite having been served with a request for "[a]ll documents and other evidence that would tend to undermine the credibility of all witnesses/informants against Petitioner" (Dkt. 190-2 at 5), Respondent did not turn over documents from Ramsundar's immigration alien file ("A-file") showing that: (1) Ramsundar had previously leveled against other individuals allegations that are identical in their essentials to the allegations he has leveled against Petitioner; (2) Ramsundar had independent knowledge of facts he had attributed to Petitioner; (3) Ramsundar had been formally admonished by the FBI when he previously served as an informant; and (4) Ramsundar had offered to provide informant services at the BFDF in exchange for immigration relief. (*See* Dkt. 190-1 at ¶¶ 52-74). Petitioner argues that Respondent breached his discovery obligations in failing to turn over this evidence and, in addition to seeking sanctions (as discussed further below), asks the Court to order Respondent to immediately disclose the following documents:

> (1) all additional documents that suggest Mr. Ramsundar or any other government witness has previously described similar allegations against other people;

> (2) all additional documents showing that the government is aware of significant credibility issues with Mr. Ramsundar or any other witnesses;

> (3) any other exculpatory evidence or records that tend to undermine the credibility of Mr. Ramsundar or other witnesses;

> (4) all documents relating to Mr. Ramsundar or other witness' work as a government informant, at any time, that tend to show untruthfulness, other misconduct, or that the government has at any time not credited the informant's information;

(5) all documents relating to any admonishments, reprimands, discipline, termination, or similar consequences in relation to Mr. Ramsundar's CI work, or that of any other witness; and

(6) any additional documents that show Mr. Ramsundar or any other witness has sought benefits in exchange for testimony, or has ever received such benefits at any time.

(Dkt. 190 at 27-28).

Respondent argues that he has met his discovery obligations, and has submitted a declaration by Steven A. Platt, Esq., stating, among other things, that: (1) subsequent to learning of the information in Ramsundar's A-file, Respondent's counsel agreed to conduct a further collection and review of the A-files for Respondent's witnesses; and (2) that on May 28, 2020, Respondent produced portions of the A-files for Ramsundar and for witnesses Hector Rivas Merino and Mohammad Al Abed. (Dkt. 184-1 at 6-7, 10). On June 4, 2020, Mr. Platt filed an additional declaration stating that Respondent has now produced "portions of the Alien Files of Mohammad Al Abed, Khaled Fallatah, Vasiliy Ranchinskiy, Ahmed Hamed, Dujon Manley, and Ali Raza, and the detention file of Vasily Ranchinskiy." (Dkt. 188-1). At the oral argument on June 12, 2020, Respondent's counsel represented on the record that they have produced all documents responsive to the six categories of documents outlined above.

The Court agrees with Petitioner that the information contained in Ramsundar's A-file was plainly responsive to Petitioner's discovery demands and should have been turned over. Indeed, Petitioner's discovery of the information has resulted in Respondent now concluding that Ramsundar is not a credible witness and electing not to produce him at the

hearing.  The Court further agrees with Petitioner that any documents falling within the categories he has enumerated in his motion to compel are responsive and should be produced.  The Court accordingly grants Petitioner's motion to compel.  Although Respondent's counsel has represented on the record that all the requested documents have now been produced, the Court makes clear that Respondent is under a Court Order to do so—and the failure to comply may result in sanctions or other appropriate relief.

Turning to Petitioner's request for sanctions, Petitioner seeks sanctions related both to Respondent's failure to produce evidence related to the credibility of Ramsundar and other witnesses, and Respondent's alleged spoliation of video evidence related to the veracity of Ramsundar's claim that Petitioner threatened his life.

The record before the Court raises serious concerns about governmental conduct in this case.  By all appearances, despite the fact that the determination that Petitioner should be detained pursuant to 8 U.S.C. § 1226a(a) and 8 C.F.R. § 241.14(d) was based in significant part on allegations by Ramsundar, it was not until Petitioner's counsel independently obtained a copy of Ramsundar's A-file that Respondent's counsel conducted a meaningful investigation into Ramsundar's credibility.  This is despite the fact that Respondent's counsel had the A-file readily available and could have examined it at any time.  Further, the evidence contained therein was sufficiently damning that Respondent has now determined not to call Ramsundar as a witness, acknowledging that there are "concerns about [Ramsundar's] credibility and ability to truthfully testify."  (Dkt. 180 at 2).  In other words, the facts on which the government relied to certify Petitioner for

potentially indefinite detention flowed in large part from a witness who a cursory investigation revealed to be unreliable, yet Respondent repeatedly urged the Court to resolve this matter without making any further inquiry.

Further, the Court finds Respondent's counsel's handling of Ramsundar's claim that Petitioner threatened his life at the very least sloppy, and possibly intentionally misleading. On March 16, 2020, in connection with his motion to enforce the Protective Order, Respondent submitted to the Court a sworn statement by Ramsundar in which he claimed that on February 27, 2020, Petitioner had threatened his life in the visitation area of the BFDF. (*See* Dkt. 138 at 4 n.1). However, on March 24, 2020, while Respondent's motion was still pending, staff at the BFDF reviewed video recordings showing that Ramsundar had not been in the visitation area on February 27th. (*See* Dkt. 184-3). Despite having evidence that a significant claim by Ramsundar was not accurate,[1] Respondent and his counsel did not take any steps to correct the record before the Court. To the contrary, on April 8, 2020, Respondent's counsel filed a memorandum in which they expressly cited to

---

[1] At the oral argument on June 12, 2020, Respondent's counsel equivocated in response to direct questions by the Court as to when they learned about the results of the investigation on March 24, 2020, which admittedly was performed at their direction (Dkt. 218 at 19). Mr. Bianco stated that it was in "early April" that they learned that the video evidence did not corroborate Ramsundar's claims. (*Id.*). However, Mr. Platt interjected and claimed that it "was at least after April 15th." (*Id.* at 20). Then Mr. Moar spoke up and acknowledged that on April 2, 2020, "DHS" told counsel that it thought counsel "ha[d] the wrong date because it doesn't appear Mr. Ramsundar was in visitation on February 27th." (*Id.* at 22). Thus, while much remains unclear, it is clear that by April 2, 2020, Respondent's counsel knew or should have known that there were questions raised concerning the accuracy of Ramsundar's claims—yet, no effort was made to correct the record before the Court.

the alleged threat against Ramsundar as evidence that Petitioner was a threat to the public, without informing the Court that the video evidence contradicted Ramsundar's claim. (Dkt. 140 at 36).

The Court is deeply troubled by counsel's conduct in this regard. As another court in this Circuit recently explained:

> An attorney is an officer of the court and owes the court fiduciary duties and loyalty. Judge Cardozo famously articulated the standard for fiduciary duties as follows: "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Moreover, attorneys owe an ethical duty of candor in all of their dealings with the Court. In order for the Court to conduct proceedings properly, it must be able to rely upon representations made on the record by attorneys licensed to practice before it.

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 118 (S.D.N.Y. 2018) (quotation and citations omitted). It is difficult for the Court to reconcile this well-established principle with Respondent's counsel's failure to correct a representation made by one of their witnesses that they knew or should have known to be false. It is of no moment that subsequent investigation revealed Ramsundar may have simply been mistaken about the date—Respondent's counsel did not know that at the time, and should have informed the Court of the discrepancy as soon as it came to light. Unfortunately, this is not the first time that Respondent's counsel has failed to maintain accuracy in their representations to the Court. (*See* Dkt. 55 at 9-11). Again, it is not clear whether this is the result of carelessness or intentional misconduct—but either way, it reflects poorly on counsel for Respondent.

It may well be that sanctions and/or further relief are in order as a result of this conduct. The Court determines that the better course is to reserve decision until the evidentiary hearing has been completed, after which further inquiry and/or discovery may be warranted. Respondent is warned that the Court will take a particularly dim view of anything less than total candor by the parties and counsel in all future stages of this proceeding.

## IV.  **Respondent's Requests to Submit Hearsay Evidence**

The Court turns next to Respondent's request to admit hearsay statements by five individuals. (Dkt. 169). The Court has already held that it will permit a party to rely on hearsay evidence if that party can establish that (1) the proffered hearsay is reliable and (2) that the provision on non-hearsay evidence would be unduly burdensome. (Dkt. 75 at 17).

While the Court and the parties have used the term "admissible" in discussing hearsay evidence, the more precise question is whether the evidence is sufficiently reliable to have probative value. As the D.C. Circuit has observed in the context of habeas corpus petitions brought by detainees at Guantanamo Bay, "the question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits." *Al-Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010); *see also Barhoumi v. Obama*, 609 F.3d 416, 422 (D.C. Cir. 2010) ("*Al-Bihani* stands for the proposition that hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable." (quotation omitted)) As the *Al-Bihani* court explained:

> A procedure that seeks to determine hearsay's reliability instead of its mere admissibility comports . . . with the reality that district judges are experienced and sophisticated fact finders. Their eyes need not be protected from unreliable information in the manner the Federal Rules of Evidence aim to shield the eyes of impressionable juries.

590 F.3d at 880.  While the instant matter is distinct from cases brought by Guantanamo detainees, the Court finds the D.C. Circuit's holdings in those matters instructive, and has thus conducted a searching review of each proffered hearsay statement to determine whether it bears sufficient indicia of reliability for the Court to rely upon it in assessing the justification for Petitioner's ongoing detention.

## A.   Ahmed Abdelraouf

Respondent has requested to submit hearsay statements from Ahmed Abdelraouf ("Abdelraouf"), a former detainee at the BFDF, regarding conversations he had with Petitioner.  However, Respondent stated at the oral argument on June 12, 2020, that he intended to present Abdelraouf as a live witness.  (*See* Dkt. 218 at 65 ("[W]e do intend to have [Abdelraouf] testify via video conference. . . .")).  The record before the Court does not support the conclusion that it would be unduly burdensome to present Abdelraouf's testimony by non-hearsay means, and so Respondent's request to present his hearsay statements is denied.

## B.   Hector Rivas Merino

Hector Rivas Merino ("Rivas Merino") was detained at the BFDF between August 2018 and December 2018, at the same time as Petitioner.  (Dkt. 169 at 5).  An FBI report dated January 18, 2019, indicates that Rivas Merino sent an anonymous letter to BFDF

staff on November 27, 2018, in which he indicated that he had overheard Petitioner and another detainee discussing making explosives.  (Dkt. 169-8 at 2).  The FBI report further states that Rivas Merino reported that Petitioner had "talked about how to make explosives and to plan attacks" and that Petitioner would "threaten[] people that he is a terrorist."  (*Id.* at 2-3).

Respondent contends that these statements by Rivas Merino are reliable because they were uncoerced and based on his personal experiences with Petitioner.  (Dkt. 169 at 5-6).  Petitioner points out in opposition that there is evidence that Rivas Merino was offered relief from deportation if he provided evidence against Petitioner.  (Dkt. 199 at 12).  Petitioner further notes that Rivas Merino is a native of El Salvador and that the record contains no useful evidence regarding his ability to understand any conversations held in Arabic.  (*Id.* at 13).

The Court agrees with Petitioner that Rivas Merino's statements are insufficiently reliable to be given probative weight in this proceeding.   There is no independent corroboration for any of Rivas Merino's claims regarding Petitioner.  *See Al Harbi v. Obama*, No. CIV.A. 05-02479(HHK), 2010 WL 2398883, at *10 (D.D.C. May 13, 2010) (finding hearsay statement unreliable because it was uncorroborated).  Further, the only evidence the Court has before it regarding Rivas Merino's ability to accurately relay a conversation held in Arabic, which is not his native language, is the statement in the FBI report that he "speaks Arabic but . . . understands more than he speak[s]."  (Dkt. 169-8 at 3).  On its face, this statement confirms that Rivas Merino is not fluent in Arabic, and the

Court thus has serious doubts regarding the reliability of his understanding of conversations held in that language.[2] *See Sulayman v. Obama*, 729 F. Supp. 2d 26, 38 (D.D.C. 2010) (finding hearsay evidence unreliable when translated by interpreters of insufficient skill). Finally, the fact that Rivas Merino was apparently offered a benefit in exchange for his testimony in December 2018 calls into question whether his statements in January 2019 were influenced by his desire for immigration relief.

In addition, Rivas Merino was apparently deported from the United States to El Salvador on December 23, 2019 (Dkt. 169-9 at ¶ 16)—after the present proceeding had been commenced and after this Court issued its decision concluding that an evidentiary hearing was necessary.  Prior to Rivas Merino's deportation, Respondent was well aware that the basis for Petitioner's detention was being challenged and could and should have taken steps (including seeking to delay the deportation or asking the Court for permission to take a deposition) to ensure that his testimony would be available.  At the very least, Respondent could and should have obtained a sworn statement from Rivas Merino.

On these facts, the Court will not permit Respondent to rely on Rivas Merino's statements to prove his case.

---

[2]     Although the FBI report does not explicitly state that the overheard conversations were in Arabic, Petitioner has stated that he "will testify that . . . he and the other individual . . . spoke exclusively in Arabic when they spoke one-on-one."  (Dkt. 199 at 13 n.8).

C.    **Abbas Raza**

Respondent also seeks to rely upon hearsay statements by Abbas Raza ("Raza"), another former detainee at the BFDF.  Although Respondent did not submit to the Court the specific statements from Raza he seeks to introduce, Petitioner identified two emails from Christopher Lemmo, an ICE Enforcement and Removal Operations ("ERO") officer working at BFDF, summarizing conversations he had with Raza.  (Dkt. 199-9; Dkt. 199-10).  In these emails, Lemmo reports that Raza told him Petitioner had stated that "civilian deaths are just a casualty of war and that 9/11 made the Muslim religion famous around the world," that "God needs to send a major disaster to the US so we will be busy licking our wounds and we will stop interfering in Muslim countries," that "[Petitioner] can control planes from a computer," and that after ISIS leader Abu Bakr al-Baghdadi was killed, Petitioner "pledged support for ISIS."   (Dkt. 199-9 at 2; Dkt. 199-10 at 2).  Respondent's counsel confirmed on the record on June 12, 2020, that these emails were the hearsay statements by Raza that Respondent was seeking to admit.

The Court finds that these hearsay statements are insufficiently reliable to be of any probative value.  First, Raza's statements are not contained in a formal government report or statement, but are merely informal, email summaries by Lemmo.  The Court cannot conclude that these informal summaries accurately convey either the substance or the

context of Raza's reports.[3]  Second, there is no independent, non-hearsay corroboration for Raza's statements.

Petitioner has also submitted evidence demonstrating that Raza has very serious credibility issues.  As Petitioner explains, Raza used a fraudulent passport and visa to initially enter the United States, and then lied to immigration authorities about having a green card.  (*See* Dkt. 212 at 1; Dkt. 212-1; Dkt. 212-2).  An immigration judge considering Raza's application for asylum found him not credible.  (*See* Dkt. 212 at 1; Dkt. 212-3 at 4).  Further, immigration authorities subsequently rejected an attempt by Raza to obtain a green card via his wife, because he could not show the marriage was genuine—"[a]mong the inconsistencies noted . . . were that Mr. Raza did not know the details of his wife's medical history, that his wife reported scars on his body that he did not have, that they reported meeting in different years, and that they reported having their wedding reception at different locations."  (Dkt. 212 at 2; *see* Dkt. 212-5).  The Court agrees with Petitioner that this history of serial misrepresentations to governmental authorities severely undermines Raza's credibility.

Further, the Court agrees with Petitioner that the timing of Raza's statements—in October 2019, when the instant action had been pending for seven months—calls into question their reliability.  Indeed, on Thursday, October 31, 2019, Gregory Conwall,

---

[3]   For example, Raza's alleged statement that Petitioner can somehow control airplanes via computer from within the BFDF is so implausible on its face that it suggests Lemmo did not fully understand what Raza was trying to convey or Raza did not accurately relate the information to Lemmo.

another ICE ERO officer, replied to Lemmo's email regarding Raza, stating "I've been hearing of a plan to talk with him, want to come out and we can talk to him to see what he wants?" (Dkt. 199-10 at 2). In other words, apparently the government understood that Raza was seeking some kind of benefit in return for providing statements against Petitioner.

The timing of Raza's statements also undercuts any claim by Respondent that it would have been unduly burdensome to produce his testimony in a non-hearsay format. Raza made his statements in October 2019, and was deported from the United States in November 2019. (*See* Dkt. 169-9 at ¶ 14). Respondent was well aware at that point in time that the basis for Petitioner's detention was being challenged and could and should have taken steps (including seeking to delay Raza's deportation or asking the Court for permission to take a deposition) to ensure that his testimony would be available.

Finally, the Court agrees with Petitioner that Respondent could and should have obtained a sworn statement from Raza. Again, Raza's statements were made during the pendency of this action, when Respondent was on notice that the factual basis for Petitioner's detention was being challenged, and Raza was in Respondent's control and custody. Under these circumstances, Respondent's failure to obtain a sworn statement calls into question the reliability of Raza's hearsay observations. For all these reasons, the Court will not permit Respondent to rely on Raza's hearsay statements in attempting to meet his burden of proof.

D.     **Ahmed Hamed**

Ahmed Hamed ("Hamed") is a former detainee at the BFDF who was roommates with Abdelraouf.  Respondent seeks to rely on hearsay statements by Hamed memorialized in a Department of Homeland Security Report of Investigation dated January 15, 2020. (Dkt. 169-4) (the "DHS Report").  According to the DHS report, Hamed was interviewed by Homeland Security Investigations special agents on November 30, 2017, and reported that: (1) on November 7, 2017, he had an argument with Petitioner regarding religion and how the Koran defines the use of violence; (2) Petitioner told Hamed that it was "good to kill someone not of the same ideology"; (3) Petitioner identified himself as a follower of ISIS leader al-Baghdadi; (4) when Hamed self-identified as American, Petitioner stated that Hamed "deserve[d] to die with them"; and (5) Petitioner stated that he did not care about killing innocent people because "it only hurt[s] the body not the soul."  (*Id*. at 3).

The Court finds that Hamed's statements have sufficient indicia of reliability to be of value to the Court as factfinder.  The statements are contained in a formal government report which, in this context, is presumed to be an accurate summarization of the statements contained therein.  *See Latif v. Obama*, 677 F.3d 1175, 1185 (D.C. Cir. 2011).  Further, there is no indication that Hamed's statements were coerced or made for the purpose of obtaining a benefit.  The statements were also made close in time to when the argument took place and before the pendency of the instant action.  Further, the fact that an argument took place between Hamed and Petitioner is corroborated by both Abdelraouf's statements and Petitioner's own admission.  (*See* Dkt. 199 at 8 n.4).  While there are certainly

differences in the three participants' statements regarding the details of the argument, the undisputed fact that the argument occurred and the fact that Hamed voluntarily and without solicitation reported it to BFDF officials are supportive of a finding of reliability.

The Court acknowledges that Hamed was convicted of a fraud-related offense (*see* Dkt. 199-1) and that his credibility is thus subject to question. However, the Court is fully capable of taking that information into account when determining the persuasive value of Hamed's statements.

The Court also finds that Respondent has shown that it would be unduly burdensome (if not impossible) to present Hamed's testimony in a non-hearsay format. Hamed was deported to Egypt in September 2018, well before this action was commenced and before the government certified Petitioner for ongoing detention based on his alleged dangerousness. (*See* Dkt. 169-9 at ¶ 13). In other words, unlike Raza or Rivas Merino, the government could not have known at the time Hamed was deported that his testimony needed to be preserved or presented in a non-hearsay manner. Further, while the FBI has been able to confirm that Hamed is presently in Egypt (*see id*.), Respondent's counsel confirmed at oral argument on June 12, 2020, that the FBI had not been able to make contact with Hamed despite ongoing efforts to do so.

For these reasons, the Court will allow Respondent to rely on Hamed's hearsay statements in seeking to satisfy his burden of proof.

E.      **Dujon Manley**

Finally, Respondent seeks to admit a letter dated January 10, 2018, in which Dujon

Manley, who was then a detainee at the BFDF, reported that Petitioner was "encouraging

the community to hate this country[,] its laws[,] and citizen[s]."   (Dkt. 169-7 at 2).

Petitioner does not object to the admission of this letter (Dkt. 199 at 18), and so Respondent

will be permitted to rely upon it in support of his contention that Petitioner's ongoing

detention is justified.

V.      **Respondent's Motion to Amend His Witness and Exhibit Lists**

On June 11, 2020, Respondent filed a Notice (Dkt. 207) informing the Court that on

June 5, 2020, the FBI issued a "letterhead memorandum" to Acting Secretary of Homeland

Security Chad F. Wolf in connection with the periodic review of Petitioner's continuing

detention required by 8 C.F.R. § 241.14 and 8 U.S.C. § 1226a.   Then, on June 12, 2020,

shortly before the final pre-hearing conference was scheduled to commence, Respondent

filed a motion to amend his witness and exhibit lists based on information contained in the

FBI's letterhead memorandum.   (Dkt. 209 (sealed version); Dkt. 219 (redacted version)).

Specifically, Respondent seeks to (1) add Vasily Ranchinskiy ("Ranchinskiy") to his

witness list and (2) add four documents to his exhibit lists: the FBI letter memorandum

dated June 5, 2020; a June 11, 2020, letter from the Department of Homeland Security

("DHS") to Petitioner's counsel; an FBI Report of Interview of Sean Orlando Smith

("Orlando Smith") dated February 12, 2020; and an FBI Report of Interview of

Ranchinskiy dated March 5, 2020.   (*See* Dkt. 219-3 at 4; Dkt. 219-4 at 11).   Petitioner

opposes Respondent's motion to the extent Respondent seeks to add Ranchinskiy to his witness list and to the extent he seeks to add the FBI interview reports of Ranchinskiy and Orlando Smith to his exhibit list.

The Court set a deadline in this case of May 22, 2020, for the filing of witness and exhibit lists.   (Dkt. 158).   The Court further permitted the parties an opportunity to supplement their witness and exhibit lists on May 29, 2020.   (*Id*.).   In setting those deadlines, the Court was explicit that "[e]xcept for extraordinary cause, the Court will not allow the presentation of witnesses or the introduction into evidence of exhibits where the same has not been identified on a party's respective list."   (*Id*.).

A scheduling order entered by a court is "not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril."   *Kassim v. City of Schenectady*, 221 F.R.D. 363, 365 (N.D.N.Y. 2003) (quotation omitted).   Further, the dates contained in such an order are "not mere suggestive guideposts; they are meaningful deadlines established by the court, in consultation with the litigants, intended to insure that the ends of justice and the need for prompt and efficient adjudication of controversies are met."   *Am. Honda Motor Co. v. V.M. Paolozzi Imps., Inc.*, No. 7:10-CV-955 FJS/ATB, 2013 WL 1296421, at *2 (N.D.N.Y. Mar. 26, 2013) (quotation omitted).   Here, it is undisputed that Respondent's attempt to add witnesses and exhibits is untimely, and so the question the Court must answer is whether the requisite extraordinary cause for allowing late amendment exists.   It does not.

Orlando Smith and Ranchinskiy were interviewed by the FBI regarding Petitioner on February 5, 2020, and February 21, 2020, respectively.  (Dkt. 219-1; Dkt. 219-2).  While Respondent's counsel could not provide the Court with the precise date they became aware of these individuals' statements, they acknowledge it was prior to the May 22nd filing deadline.  (*See* Dkt. 218 at 34-35).  In other words, Respondent could and should have timely included these witnesses and/or their statements on his witness and exhibit lists filed on May 22, 2020.

Respondent's counsel has argued that they did not appreciate Ranchinskiy's and Orlando Smith's relevance to the instant matter until the FBI issued the letter memorandum on June 5, 2020.  As the Court noted at oral argument on June 12, 2020, this argument is entirely circular—the FBI letter memorandum is merely a collection of factual claims regarding Petitioner's alleged dangerousness.  (*See id.*).  Respondent's argument, essentially, is that these fact witnesses did not become relevant until the government decided they were relevant by including their claims in the FBI letter memorandum.  But the purpose of the May 22nd filing deadline was, in part, to require Respondent to make those sorts of relevancy determinations sufficiently in advance of the evidentiary hearing to allow for meaningful investigation and response by Petitioner.  Plainly the government did not believe these witnesses were relevant when they were relying on the evidence gleaned from Ramsundar, but once Ramsundar's credibility was seriously undermined, the government's tactics changed.  However, the responsibility for failing to discover the

credibility issues with respect to Ramsundar earlier falls squarely at the feet of the government.

The Court has been clear that "[t]he subject of the evidentiary hearing is . . . whether Petitioner's release would threaten the national security of the United States or the safety of the community or any person." (Dkt. 75 at 5). Ranchinskiy's and Orlando Smith's statements clearly are relevant to this inquiry, and if Respondent wished to rely upon them in satisfying his burden of proof, it was his obligation to do so in a timely fashion and in accordance with the Court's Orders. He did not—indeed, with respect to Orlando Smith's hearsay statements, Respondent has not even attempted to satisfy the standard set by the Court for admissibility.

Further, the Court agrees with Petitioner that he would be severely prejudiced were Respondent now permitted to rely on Ranchinskiy's and Orlando Smith's statements. The history of this case amply demonstrates the importance of investigation by Petitioner into the credibility of the witnesses against him. Had Petitioner not had the opportunity to investigate Ramsundar's credibility, Ramsundar would presumably still be a key witness against him, despite the now-known serious concerns about the veracity of Ramsundar's claims. But at this late juncture, Petitioner lacks the time to meaningful investigate the credibility of either Ranchinskiy or Orlando Smith. Respondent's failure to demonstrate extraordinary cause and the prejudice to Petitioner that would result from permitting Respondent's requested amendments lead inescapably to the conclusion that Petitioner

cannot be permitted to admit evidence related to Ranchinskiy or Orlando Smith at the evidentiary hearing.[4]

The Court does not reach this conclusion lightly—to the contrary, the Court is frustrated that Respondent's inexplicable delay has necessitated this result. As the Court set forth above, it is the factfinder in this case and wants to have a full, robust record on which to make its determinations. But in the absence of a sufficient opportunity for investigation by Petitioner, the Court has no way to meaningfully assess the probative value of Ranchinskiy's and/or Orlando Smith's statements. The Court denies Respondent's request to add Ranchinskiy to his witness list and to add the FBI interview reports of Ranchinskiy and Orlando Smith to his exhibit list.

However, Petitioner does not object to the inclusion of the FBI letter memorandum dated June 5, 2020, on Respondent's exhibit list, and has made no argument related to the inclusion of the June 11, 2020, letter from DHS to Plaintiff's counsel. These documents were created after the Court's filing deadline and could not have been timely disclosed. The Court will accordingly permit Respondent to add these documents to his exhibit list. This determination is without prejudice to Petitioner's ability to raise an admissibility challenge.

---

[4]     The Court further notes that delaying the hearing so as to afford Petitioner time to conduct an investigation is not a viable option as it would unfairly prejudice Petitioner who is held in custody. Indeed, the hearing was originally scheduled to go forward on April 28, 2020, but was adjourned because of the COVID-19 pandemic. (Dkt. 150).

## **CONCLUSION**

For the reasons set forth above and stated on the record at oral argument, the Court: (1) denies Petitioner's motion to compel and for a protective order (Dkt. 91), except that the Court grants Petitioner's request that in the event Respondent calls Petitioner as a witness, he must call Petitioner last; (2) denies as moot Respondent's motion to defer consideration of any potential invocation of the state secrets privilege (Dkt. 90); (3) denies Respondent's motion for sanctions (Dkt. 154; Dkt. 172); (4) grants Petitioner's motion to compel and reserves decision on his accompanying motion for sanctions (Dkt. 164); (5) grants Respondent's request to present hearsay evidence with respect to Ahmed Hamed and Dujon Manley and denies Respondent's request to present hearsay evidence with respect to Ahmed Abdelraouf, Abbas Raza, and Hector Rivas Merino; and (6) grants in part and denies in part Respondent's motion to amend his witness and exhibit lists (Dkt. 209; Dkt. 219).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      June 18, 2020
            Rochester, New York