UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

ADHAM AMIN HASSOUN,

           Petitioner,

    v.

JEFFREY SEARLS, in his official
capacity as Acting Assistant Field Office
Director and Administrator of the Buffalo
Federal Detention Facility,

          Respondent.

———————————————————————

**DECISION AND ORDER**

1:19-CV-00370 EAW

## <u>INTRODUCTION</u>

Petitioner Adham Amin Hassoun ("Petitioner") is a civil immigration detainee currently housed at the Buffalo Federal Detention Facility (the "BFDF") in Batavia, New York, who seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and 8 U.S.C. § 1226a(b). Petitioner contends that his current detention is not lawfully authorized by statute or regulation and that he must be released, with appropriate conditions of supervision. Respondent Jeffrey Searls ("Respondent"), the Acting Assistant Field Office Director and Administrator of the BFDF, contends that Petitioner is permissibly detained pursuant to both 8 U.S.C. § 1226a(a) and 8 C.F.R. § 241.14(d) .

For the reasons discussed below and in its prior decisions in this matter, the Court finds that neither 8 U.S.C. § 1226a(a) nor 8 C.F.R. § 241.14(d) lawfully authorizes Petitioner's continued detention. Accordingly, the Court grants the Petition and orders

Respondent to release Petitioner, subject to the conditions of supervision set forth below. The Court further denies Respondent's request that Petitioner's release be stayed pending appeal (Dkt. 242); however, the Court temporarily stays Petitioner's release until 12:00 p.m. on July 2, 2020, to allow Respondent an opportunity to seek emergency relief from an appellate court if he so chooses.

## **BACKGROUND**

The Court has issued several prior Decisions and Orders in this matter (*see* Dkt. 55; Dkt. 75; Dkt. 138; Dkt. 150; Dkt. 225), familiarity with which is assumed for purposes of this Decision and Order. For ease of reference, the Court has summarized the salient facts and procedural history below.

Petitioner is "a Palestinian who, while born in Lebanon, is not a citizen of Lebanon." *Hassoun v. Sessions*, No. 18-CV-586-FPG, 2019 WL 78984, at *1 (W.D.N.Y. Jan. 2, 2019). Removal proceedings were instituted against him in 2002, after he failed to comply with the conditions of his student visa, and his final order of removal became administratively final in 2003. *Id.* However, before he could be removed, Petitioner was taken into custody in early 2004 on federal criminal charges, and was ultimately convicted of "(1) conspiracy to murder, kidnap and maim persons in a foreign country (18 U.S.C. § 956(a)(1)); (2) conspiracy to provide material support for terrorism (18 U.S.C. § 371); and (3) providing material support to terrorists (18 U.S.C. § 2339A(a))." *Id.*

Petitioner was sentenced to 188 months in prison and 20 years supervised release. *See United States v. Jayyousi*, 657 F.3d 1085, 1092 (11th Cir. 2011). Petitioner completed his term of imprisonment in October 2017, and "was again detained by immigration

authorities on his original order of removal." *Hassoun*, 2019 WL 78984, at *1. However, to date, United States Immigration and Customs Enforcement ("ICE") has been unsuccessful in removing Petitioner from this country, despite ongoing efforts to do so. Petitioner has remained detained in immigration custody since October 2017. (Dkt. 1 at ¶ 45).

In May 2018, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, contending that he was being unlawfully held by Respondent. *Hassoun*, 2019 WL 78984, at *1. On January 2, 2019, the Hon. Frank P. Geraci, Chief United States District Judge, issued a Decision and Order in which he found that there was no significant likelihood of Petitioner's removal from the United States in the reasonably foreseeable future and concluded that the Government had "exceeded its authority to detain Petitioner under 8 U.S.C. §§ 1227(a)(1)(C) & 1231(a)(6)." *Id*. at *8. Judge Geraci ordered that Petitioner be released on March 1, 2019, "unless the Court orders otherwise," but further held that "[t]he Court's order does not preclude Respondent . . . from continuing to detain Petitioner on any other permissible basis under applicable statutes and regulations." *Id*. Judge Geraci ordered Respondent to "notify the Court if he determines that Petitioner will be detained on some other permissible basis." *Id*.

On February 22, 2019, Respondent filed a notice informing Judge Geraci that he intended to continue to detain Petitioner beyond March 1, 2019, pursuant to 8 C.F.R. § 241.14(d). Resp't's Notice of Pet'r's Detention, *Hassoun v. Sessions*, No. 18-CV-586-FPG, Dkt. 55 (W.D.N.Y. Feb. 22, 2019). Judge Geraci thereafter entered a Text Order stating that he had "reviewed the notice and concludes that it complies with the Court's

order. No further notice from Respondent is required, and this case remains closed." *Hassoun v. Sessions*, No. 18-CV-586-FPG, Dkt. 58 (W.D.N.Y. Feb. 26, 2019).

Petitioner commenced the instant habeas corpus proceeding on March 15, 2019. (Dkt. 1). He filed an Amended Petition and a memorandum in support thereof on May 14, 2019. (Dkt. 13; Dkt. 14). Respondent filed his opposition to the Amended Petition on June 28, 2019. (Dkt. 17). Petitioner filed a reply on August 9, 2019. (Dkt. 25).

Also on August 9, 2019, then-Acting Secretary of Homeland Security Kevin K. McAleenan ("Secretary McAleenan") certified Petitioner's continued detention under 8 C.F.R. § 241.14(d). (Dkt. 30-1). Secretary McAleenan further certified Petitioner's continued detention as "an alien engaged in terrorist activity and engaged in an activity that endangers the national security of the United States" under § 1226a. (Dkt. 30-2 at 2).

At the request of the parties, supplemental briefing was submitted in September and October of 2019. (*See* Dkt. 26; Dkt. 28; Dkt. 30; Dkt. 32). Oral argument was held before the undersigned on November 22, 2019. (Dkt. 53). On December 13, 2019, the Court entered a Decision and Order finding that Petitioner's continued detention is not lawfully authorized by 8 C.F.R. § 241.14(d) and ordering an evidentiary hearing regarding the lawfulness of Petitioner's continued detention pursuant to 8 U.S.C. § 1226a. (Dkt. 55).

After additional briefing by the parties (*see* Dkt. 60; Dkt. 61; Dkt. 63; Dkt. 67), on January 24, 2020, the Court issued a Decision and Order regarding the parameters of the evidentiary hearing. (Dkt. 75). In particular, the Court held that: (1) at the evidentiary hearing, Respondent would bear the burden of demonstrating by clear and convincing evidence that the factual predicate for continued detention under 8 U.S.C. § 1226a(a)(6)

was met in this case[1]; (2) Petitioner bore the burden of demonstrating that the identity of the confidential informants in this case should be revealed; and (3) hearsay evidence would be admissible at the evidentiary hearing if the party proffering such evidence demonstrated that it was reliable and that it would be unduly burdensome to submit non-hearsay evidence. (*Id.* at 21-22).

The Court permitted the parties to engage in discovery in advance of the evidentiary hearing. (*See* Dkt. 57; Dkt. 58; Dkt. 70). On February 28, 2020, Petitioner filed a motion to compel and for a protective order (Dkt. 91), and Respondent filed a motion to defer consideration of any potential assertion of the state secrets privilege (Dkt. 90). The Court heard oral argument on the parties' discovery motions on March 16, 2020, and orally announced certain rulings while reserving decision as to other issues. (Dkt. 113; Dkt. 114).

On March 31, 2020, Respondent filed a motion to adjourn the evidentiary hearing, which was then scheduled to commence on April 28, 2020, due to the COVID-19 pandemic. (Dkt. 120). Petitioner filed a cross-motion seeking a transfer to home incarceration and, barring such relief, opposed the motion to adjourn. (Dkt. 122). On April 10, 2020, the Court entered a Decision and Order denying Petitioner's motion for transfer to home incarceration and granting Respondent's request to adjourn the evidentiary hearing. (Dkt. 150).

---

[1]     In relevant part, § 1226a(a)(6) provides that an alien may continue to be detained thereunder "only if the release of the alien will threaten the national security of the United States or the safety of the community or any person." 8 U.S.C. § 1226a(a)(6).

In consultation with the parties, the Court rescheduled the evidentiary hearing to commence on June 24, 2020. (Dkt. 158). The Court set a deadline of May 22, 2020, for filing of witness and exhibit lists and scheduled a final pre-hearing conference for June 12, 2020. (*Id.*). The Court further ordered the parties to submit pre-hearing legal memoranda by May 22, 2020, that, among other things, "identif[ied] any hearsay evidence that the party seeks to present at the evidentiary hearing, setting forth the legal basis for the proposed admission of the testimony in accordance with the framework identified by the Court in its Decision and Order entered on January 24, 2020." (*Id.*). On May 22, 2020, Respondent submitted a pre-hearing memorandum containing a request to present hearsay statements from five individuals at the evidentiary hearing. (Dkt. 169).

On June 11, 2020, Respondent filed a Notice (Dkt. 207) informing the Court that on June 5, 2020, the FBI issued a letterhead memorandum (Dkt. 223) (the "June FBI Memo") to Acting Secretary of Homeland Security Chad F. Wolf  in connection with the periodic review of Petitioner's continuing detention required by 8 C.F.R. § 241.14(d) and 8 U.S.C. § 1226a. Respondent filed a motion on June 12, 2020, to amend his witness and exhibit lists based on information found in the June FBI Memo. (Dkt. 209 (sealed version); Dkt. 219 (redacted version)).

A pre-hearing conference was conducted on June 12, 2020, at which time the Court resolved a number of issues but reserved decision on others. (Dkt. 218; Dkt. 220). On June 15, 2020, the Court issued a Text Order identifying its resolution of the issues on which it had reserved decision. (Dkt. 216). Then, on June 18, 2020, the Court issued a Decision and Order explaining in detail its reasoning for its various decisions concerning

the discovery and pre-hearing issues.  (Dkt. 225).[2]  Among other things, the Court denied Respondent's request to present hearsay evidence with respect to three of the five proposed hearsay witnesses (one of whom Respondent indicated it was not intending to present as a hearsay witness, but rather as a live witness) and largely denied Respondent's belated request to amend his witness and exhibit lists.  (*Id.*).

During the evening of June 18, 2020, Respondent filed a Notice and Motion to Cancel the Evidentiary Hearing and Proceed to Final Judgment.  (Dkt. 226) (the "Motion to Cancel").  In the Motion to Cancel, Respondent—while preserving all his prior arguments—"advise[d] that [his] remaining evidence is insufficient to meet the standard set by the Court."  (*Id.* at 3).  On this basis, Respondent asked the Court "to cancel the evidentiary hearing and to rule on the papers in this case . . . and issue final judgment."  (*Id.*).[3]

---

[2]     In its Decision and Order of June 18, 2020, the Court reserved decision on Petitioner's motion for sanctions based on alleged governmental misconduct.  (Dkt. 225 at 27; *see* Dkt. 164).  That motion remains outstanding, and the Court intends to order further briefing and render a decision thereon in due course.

[3]     In the Motion to Cancel, Respondent cited to the need, in view of his concession on the inability to satisfy the burden set by this Court, to "alleviate the need for unnecessary travel and avoid health risks."  (Dkt. 226 at 4).  The record should be clear that the Court takes seriously the ongoing global COVID-19 pandemic.  However, this District employed a Board-certified infectious disease physician, and based on that doctor's guidance, the Court had implemented extensive protocols to minimize any risk associated with the evidentiary hearing, including limiting the number of individuals in the courtroom, limiting movement within the courtroom, implementing a universal masking policy, installing a plexiglass barrier to separate witnesses from attorneys, and allowing witnesses and attorneys to appear remotely.  While no precautions can eliminate the risk entirely, concerns about COVID-19 did not, under the circumstances, warrant cancellation of evidentiary hearing.  Indeed, a civil jury trial was held earlier this month in this courthouse

Respondent filed a motion to expedite consideration of the Motion to Cancel (Dkt. 227), which the Court granted to the extent of setting a telephone conference to discuss the matter on June 19, 2020 (Dkt. 228).  At that conference, Petitioner's counsel advised the Court that Petitioner opposed the Motion to Cancel.  (*See* Dkt. 241).  However, in his written response to the Motion to Cancel filed on June 22, 2020, Petitioner withdrew his opposition.  (Dkt. 232).  The Court held a telephone conference on June 22, 2020 (Dkt. 238) and issued a Text Order granting Respondent's unopposed request to cancel the evidentiary hearing (Dkt. 237).  At the telephone conference on June 22, 2020, Respondent's counsel conceded that, at this time and taking into account the Court's evidentiary rulings, not only can Respondent not demonstrate that Petitioner's release would threaten national security or the safety of any person or the community by clear and convincing evidence, he cannot satisfy the lower preponderance of the evidence standard. (*See* Dkt. 244 at 9, 18-19).

The Court orally announced at the telephone conference on June 22, 2020, that it would be entering a written decision granting the Petition and ordering Petitioner's release. (*Id*. at 21-22).  The Court further ordered the parties to submit any agreed-upon conditions of supervision by June 23, 2020, and set a deadline of June 24, 2020, for Respondent to file a motion for a stay of Petitioner's release pending appeal.  (Dkt. 236; Dkt. 237).

---

and the judges in this District are continuing with their constitutional duties while implementing and utilizing appropriate precautions.

The parties submitted agreed-upon conditions of supervision on June 23, 2020. (Dkt. 240). Respondent filed his motion for a stay on June 24, 2020. (Dkt. 242). Petitioner filed his opposition on June 26, 2020 (Dkt. 247; Dkt. 248), and Respondent filed his reply on June 27, 2020 (Dkt. 250).[4]

## DISCUSSION

### I.   Respondent Cannot Lawfully Continue to Detain Petitioner

In Petitioner's prior habeas petition, Judge Geraci held that the government had "exceeded its authority to detain Petitioner under 8 U.S.C. §§ 1227(a)(1)(C) & 1231(a)(6)," *Hassoun*, 2019 WL 78984, at *8. Neither party appealed that determination, nor have they contested that it governs here.[5] Accordingly, the question before this Court is whether there is some other lawful basis to justify Petitioner's continued detention.

Respondent has identified two legal authorities that he contends authorize Petitioner's ongoing detention: 8 U.S.C. § 1226a(a) and 8 C.F.R. § 241.14(d) . The Court has already concluded that 8 C.F.R. § 241.14(d) is "a legal nullity that cannot authorize the

---

[4]     Both parties failed to comply with the Court's page limits for motions, as reflected in Local Rule of Civil Procedure 7(a)(2)(C), which provides that "[m]emoranda in support of or in opposition to any motion shall not exceed twenty-five (25) pages in length, and reply memoranda shall not exceed ten (10) pages in length." Respondent's memorandum in support of his motion to stay is 28 pages, Petitioner's response is 49 pages, and Respondent's reply is 28 pages. While the Court appreciates the weightiness of the issues at hand and their importance to both parties, compliance with the Court's Local Rules is expected. In the future, the Court expects the parties to seek leave prior to filing oversized briefs.

[5]     The government does reserve the right to re-detain Petitioner pursuant to § 1231(a)(6) in the event "there again become[s] a significant likelihood of his removal in the reasonably foreseeable future." (Dkt. 242-1 at 28 n.3).

ongoing, potentially indefinite detention of Petitioner." (Dkt. 55 at 25). This ruling is law of the case and governs the Court's final disposition of the Petition.

Turning to 8 U.S.C. § 1226a(a), Petitioner has attacked the constitutionality of this statute on numerous bases. (*See* Dkt. 55 at 25-26). While the Court has not reached the majority of Petitioner's constitutional claims, it has held that (1) "§ 1226a expressly provides for habeas corpus review of 'any action or decision relating to this section (including judicial review of the merits of a determination made under subsection (a)(3) or (a)(6))'" (Dkt. 55 at 26-27 (emphasis omitted) (quoting 8 U.S.C. § 1226a(b)(1))), and (2) due process requires that, in connection with that judicial review, Respondent demonstrate to the Court by clear and convincing evidence that Petitioner's release would threaten the national security of the United States or the safety of the community or any person (*see* Dkt. 75 at 6-12).

Respondent has conceded that at this point in time, and taking into account the Court's evidentiary rulings, he cannot demonstrate—by clear and convincing evidence or even by a preponderance of the evidence—that Petitioner's release would threaten the national security of the United States or the safety of the community or any person. (*See* Dkt. 244 at 9). Accordingly, the factual predicate for Petitioner's continued detention under § 1226a(a)(6) is not satisfied and thus, even assuming § 1226a is constitutional, Petitioner cannot lawfully be detained thereunder. In light of this holding, the Court finds—and the parties have confirmed they agree—that it is unnecessary for the Court to reach Petitioner's remaining arguments regarding the validity of § 1226a and its applicability to him. (*See id.* at 8-10).

- 10 -

Having concluded that Petitioner's ongoing detention is not authorized by regulation or statute, the Court orders Respondent to release Petitioner, under the conditions of supervision set forth below.  *See Boumediene v. Bush*, 553 U.S. 723, 779 (2008) ("[T]he habeas court must have the power to order the conditional release of an individual unlawfully detained[.]").

## II.   Conditions of Supervision

The parties agree that this Court has the authority to set conditions of supervision in connection with Petitioner's release.  (*See* Dkt. 232 at 2 n.1; Dkt. 244 at 10); *see also Zadvydas v. Davis*, 533 U.S. 678, 700 (2001) ("[T]he alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions.").  The parties have further stipulated to the following conditions of supervision (with Respondent, of course, reserving his contention that Petitioner should not be released under any conditions):

> 1.    Petitioner shall be subject to home confinement at ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.[6]

---

[6]    To protect the privacy of Petitioner's family members, the Court has redacted from the publicly filed version of this Decision and Order the address at which Petitioner will reside and the names of the allowed residents and visitors.  *See  Lown v. Salvation Army, Inc.*, No. 04 CIV. 01562 SHS, 2012 WL 4888534, at *2 (S.D.N.Y. Oct. 12, 2012) (redaction of names, phone numbers, and addresses was appropriate to "vindicate[] the privacy interest a third-party has in sensitive personal information").  This information "has no bearing on adjudication in this case and implicates important privacy concerns." *Abbey v. 3F Therapeutics, Inc.*, No. 06-CV-409 KMW GWG, 2010 WL 11677681, at *1 (S.D.N.Y. Aug. 3, 2010).

2.      Petitioner shall wear an ankle bracelet monitor equipped with a monitoring device.

3.      Petitioner shall not leave home confinement without advance permission.

4.      Petitioner shall report the names of any visitors, except immediate family members (defined as mother, father, sister, brother, daughter, or son) in advance of the visit.  The following individuals are pre-approved family members whose visit need not be reported in advance: ████████████ (Petitioner's sister's ex-spouse); ██████████████ (Petitioner's nephew); ███████████ (Petitioner's nephew's wife); ████████████████ (Petitioner's grandnephew). The following individuals are residents at the address of home confinement, ████████████████████████, and are not considered visitors for this condition: ████████████████ (sister); ████████████ (        son); ██████████████ (        daughter-in-law); ████ ████████████ (        grandson).

5.      Petitioner shall be permitted to make emergency or urgent medical visits without prior authorization but must report such visits within seven days of the visit.

6.      Petitioner shall be permitted to visit a pre-approved place of worship for pre-approved scheduled events or activities.

7.      Petitioner shall not possess any Internet-capable device without prior permission, and any such device shall be subject to monitoring.  Petitioner shall be permitted use of one or more such devices approved by the government.

8.      Petitioner shall not communicate or associate with any known terrorist or extremist, including but not limited to persons associated with ISIS, al Qaeda, or any persons or groups known to be hostile to the United States or who support violence against the United States or its allies or interests or any civilians.

9.      Petitioner shall not create, possess, access, or otherwise view material that reflects terrorist or extremist views.  This condition excludes any such material that is presented by a mainstream English-language news outlet in reporting on current events.

10.     Petitioner shall not make any attempts to radicalize others, including trying to persuade others (1) to view terrorist or extremist material; (2) to

swear allegiance to or join terrorist or extremist causes or groups; (3) to commit acts of terrorism or violence; or (4) to assist others in committing acts of terrorism or violence.

11.    Petitioner shall comply fully with the U.S. government's efforts to effectuate his removal, including by providing requested information and documentation in support of these efforts.

12.    The parties shall review these conditions every six months.

(Dkt. 240).  The Court has reviewed the jointly proposed conditions of supervision and finds they are appropriate and rationally related to the government's legitimate interests in "reducing the number of absconding aliens," "accounting for and being able to produce any alien who becomes removable," and "protecting public safety and national security." *Yusov v. Shaughnessey*, 671 F. Supp. 2d 523, 530 (S.D.N.Y. 2009) (quotations omitted), *aff'd*, 396 F. App'x 780 (2d Cir. 2010).   The Court accordingly adopts and imposes these conditions of supervision.

## III.   Motion to Stay Release Pending Appeal

Respondent has asked the Court to stay Petitioner's release pending appeal.  (Dkt. 242).  Petitioner opposes this request.  (Dkt. 247).  For the reasons set forth below, the Court finds that a stay pending appeal is not warranted.  However, the Court will enter a brief stay until 12:00 p.m. on Thursday, July 2, 2020, to allow Respondent an opportunity to seek emergency relief from an appellate court.

### A.   Legal Standard

"There is a presumption of release pending appeal where a petitioner has been granted habeas relief."  *O'Brien v. O'Laughlin*, 557 U.S. 1301, 1302 (2009) (Breyer, J., in Chambers); *see* Fed. R. App. P. 23(c); *Hilton v. Braunskill*, 481 U.S. 770, 774 (1987).

- 13 -

"However, this presumption can be overcome if the traditional factors regulating the issuance of a stay weigh in favor of granting a stay." *O'Brien*, 557 U.S. at 1302. The factors are: (1) whether the moving part has a substantial likelihood of success on the merits; (2) whether the moving party will suffer irreparable injury if the stay is denied; (3) whether the issuance of the stay will cause substantial harm to other parties; and (4) whether the public interest will be served by issuance of a stay. *United States v. Philip Morris Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009); *see also Nken v. Holder*, 556 U.S. 418, 425-26 (2009) (explaining that under the traditional standard for issuing a stay pending appeal, "a court considers four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." (quotation omitted)). "These factors interrelate on a sliding scale and must be balanced against each other." *Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 56 (D.D.C. 2009) (quoting *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998)). In other words:

> To justify the granting of a stay, a movant need not always establish a high probability of success on the merits. Probability of success is inversely proportional to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or *vice versa*.

*Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985); *see also Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) ("The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [the moving

party] will suffer absent the stay.  Simply stated, more of one excuses less of the other."

(quotation omitted)).

**B.**     **Likelihood of Success on the Merits**

As to the first factor:

> The moving party is not required to show that it is assured of success on
> appeal.  Rather, it can satisfy the first factor by raising in its appeal "questions
> going to the merits so serious, substantial, difficult and doubtful, as to make
> them a fair ground for litigation and thus for more deliberative investigation."

*Al-Adahi v. Obama*, 672 F. Supp. 2d 81, 83 (D.D.C. 2009) (quoting *Wash. Metro. Area*

*Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)); *see also*

*Hilton*, 481 U.S. at 778 ("Where the State establishes that it has a strong likelihood of

success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case

on the merits, continued custody is permissible if the second and fourth factors in the

traditional stay analysis militate against release.  Where the State's showing on the merits

falls below this level, the preference for release should control." (citations omitted)).

Here, the Court agrees with Respondent that certain aspects of this case involve

novel and difficult questions of law.  (*See* Dkt. 242-1 at 1).  However, when the case as a

whole is examined, it becomes clear that Respondent cannot demonstrate he is likely to

prevail on appeal, or even that there is a substantial case on the merits.  Distilled to its core,

Respondent's position is that he should be able to detain Petitioner indefinitely based on

the executive branch's say-so, and that decision is insulated from any meaningful review

by the judiciary.  The record in this case demonstrates firsthand the danger of adopting

Respondent's position.  Respondent's position cannot withstand constitutional scrutiny.

### 1.    __Detention Under 8 C.F.R. § 241.14(d)__

Respondent contends that he is likely to succeed on his contention that Petitioner's conditioned detention is authorized by 8 C.F.R. § 241.14(d).  In particular, Respondent contends that (1) "the regulation plainly authorizes Petitioner's detention," (2) the regulation is "well within the scope" of the authority delegated to the Secretary of Homeland Security by § 1231(a)(6); and (3) the regulation is constitutional.  (Dkt 242-1 at 14-22).

"Courts have described the likelihood of success on appeal as a calculation that requires disinterested analysis and frank self-criticism by the district court. . . ."  *Waiters v. Lee*, 168 F. Supp. 3d 447, 452 (E.D.N.Y. 2016) (quotation omitted).  In other words, while the Court has rejected Respondent's arguments in deciding the Petition in favor of Petitioner, it must now "review[] the circumstances of the case with all the disinterest [it] can muster[.]"  *Id.*

For reasons set forth at length in its Decision and Order of December 13, 2019, and that it need not repeat here, the Court is of the firm conviction that 8 C.F.R. § 241.14(d) is incompatible with the Supreme Court's interpretation of § 1231(a)(6), as set forth in *Zadvydas v. Davis*, 533 U.S. 678 (2001), and *Clark v. Martinez*, 543 U.S. 371 (2005), and therefore the regulation is not a valid basis for Petitioner's detention.  (*See* Dkt. 55 at 11-17).[7]  The Court nonetheless acknowledges that this was an issue of first impression,

---

[7]     Indeed, in *Clark* the Supreme Court expressly held that it was Congress' prerogative to address concerns that "the security of our borders will be compromised if [the government] must release into the country inadmissible aliens who cannot be removed"

and it cannot discount the possibility that an appellate court could reach a contrary conclusion. As to this issue regarding whether the regulation—which reads § 1231(a)(6) as allowing indefinite detention under certain circumstances—is foreclosed by *Zadvydas* and *Clark*, the Court finds that there are substantial questions going to the merits.

However, the standard for issuing a stay pending appeal is not whether Respondent may prevail as to one particular issue, but whether he is ultimately likely to succeed in having this Court's judgment overturned. Here, Respondent has not demonstrated that he can make out even a substantial case on the merits that the regulation is constitutional, which is fatal to his argument. While Respondent argues that the regulation offers "sufficient safeguards" against an erroneous deprivation of Petitioner's liberty (*see* Dkt. 242-1 at 18-20), there is no dispute that the regulation, as interpreted by Respondent, does not provide for one of the most fundamental due process protections: a neutral decisionmaker. In particular, while Respondent states that "[l]egal challenges to the regulation are reviewed by Article III judges in habeas" (*id*. at 20), he has also argued that "the agency's bottom-line factual conclusion . . . is untouchable" (Dkt. 17-4 at 48-49; *see also* Dkt. 250 at 11 (Respondent contends in reply that it is sufficient that "a neutral decision maker is available for legal challenges")). Thus, Respondent's interpretation of the regulation does not allow for any judicial review of the factual determination that

---

and noted "[t]hat Congress has the capacity to do so is demonstrated by" the enactment of § 1226a. 543 U.S. at 386 & n.8.

Petitioner's release "presents a significant threat to the national security or a significant risk of terrorism."  8 C.F.R. § 241.14(d)(1)(ii).

"[D]ue process requires a neutral and detached judge in the first instance[.]" *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 617-18 (1993) (quotation omitted); *see also Zadvydas*, 533 U.S. at 692 ("[T]he Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights." (quotation omitted)).  In *Boumediene v. Bush*, 553 U.S. 723 (2008), which—like the instant matter—involved a non-citizen petitioner, the Supreme Court explained that "[w]here a person is detained by executive order, rather than, say, after being tried and convicted in a court, the need for collateral review is most pressing" and "[t]he habeas court must have sufficient authority to conduct a meaningful review of both <u>the cause for detention</u> and the Executive's power to detain."  *Id.* at 783 (emphasis added).  Accordingly, the *Boumediene* court found it "constitutionally required" for a habeas court to have "some authority to assess the sufficiency of the Government's evidence against the detainee."  *Id.* at 786.

It is against the backdrop of this caselaw that Respondent would have to persuade an appellate court that the Constitution allows for a procedure whereby the Department of Homeland Security can detain Petitioner for the rest of his life based on a non-adversarial proceeding with no judicial oversight of the factual findings.  Respondent has cited to no cases that support this remarkable proposition—to the contrary, the Supreme Court has "consistently . . . recognized that an individual challenging his detention may not be held at the will of the Executive without recourse to some proceeding before a neutral tribunal

to determine whether the Executive's asserted justifications for that detention have basis in fact and warrant in law." *Hamdi v. Rumsfeld*, 542 U.S. 507, 528 (2004) (plurality opinion) (emphasis added).[8]

There is good reason for this well-established principle of due process jurisprudence. The inadequacy of the procedures set forth in the regulation, wherein the Department of Homeland Security serves as both prosecutor and judge, are amply demonstrated by the record in this case. As set forth above, on August 9, 2019, Secretary McAleenan certified Petitioner's continued detention under both 8 C.F.R. § 241.14(d) and § 1226a. (Dkt. 30-2 at 2). Secretary McAleenan's certificate was based on a Federal Bureau of Investigation ("FBI") letterhead memorandum dated February 21, 2019, summarizing allegations that various other detainees at the BFDF had made against Petitioner. (Dkt. 20 at 10-14) (the "February FBI Memo").

---

[8]    In his reply, Respondent cites to *Department of Homeland Security v. Thuraissigiam*, — U.S. —, 2020 WL 3454809 (June 25, 2020), for the proposition that "the Due Process Clause does not require a neutral decision maker in every context for every alien." (Dkt. 250 at 11). *Thuraissigiam* is wholly inapposite. The petitioner in *Thuraissigiam* had not effected an entry into the United States and the majority opinion concluded that he accordingly was not entitled to any process beyond that provided for by statute. 2020 WL 3454809, at *18. *Thuraissigiam* says nothing about the process due to an individual like Petitioner, who has been present in the United States for more than 30 years and who is seeking not to be allowed into this country in the first instance, but to be freed from detention within it. *See Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *cf. Guzman v. Tippy*, 130 F.3d 64, 66 (2d Cir. 1997) ("An excluded alien's rights are determined by the procedures established by Congress and not by the due process protections of the Fifth Amendment.").

On their face, the allegations in the February FBI Memo paint a serious and disturbing picture regarding Petitioner's alleged dangerousness.  For example, the February FBI Memo states that "three detainees confined with [Petitioner] separately reported . . . that [Petitioner] was attempting to recruit fellow detainees in support of ISIS," that Petitioner is a "self-identified follower of ISIS leader al-Baghdadi," that Petitioner "was overheard by a different individual telling a fellow detainee how to make explosives and plan attacks," and that Petitioner told a fellow detainee who self-identifies as American that he "deserves to die with them."  (*Id*. at 12 (original alterations omitted)).  The February FBI Memo's most specific and troubling allegations are that Petitioner told a fellow detainee that he was communicating with a recruiter for ISIS in Trinidad and Tobago, that he had identified potential targets for attacking American interests in Trinidad and Tobago, and that he had developed a potential plan to attack a liquid nitrile gas ("LNG") installation in Port Everglades, Florida.  (*Id*.).

These allegations, which Respondent contends constitute sufficient evidence to warrant Petitioner's indefinite detention, cannot bear meaningful scrutiny.  During the course of the instant litigation, it was revealed that Shane Ramsundar, a detainee at the BFDF, was the source for the specific allegations regarding Petitioner's alleged contacts in Trinidad and Tobago and development of plans to attack American interests in Port Everglades and Trinidad and Tobago.  (*See* Dkt. 196-13).  However, Petitioner's counsel uncovered evidence that wholly undercuts Ramsundar's credibility—ultimately causing Respondent to completely abandon his reliance on Ramsundar's claims.  Specifically, Petitioner's counsel discovered that Ramsundar's alien file ("A-file") contained an eight-

page handwritten document by Ramsundar dated April 2, 2018 (before Ramsundar made his allegations against Petitioner), in which he describes discussing in the 2000s <u>the same plot to attack to attack an LNG installation in South Florida that he later attributed to Petitioner</u>.   (*See* Dkt. 196-12).   Petitioner's counsel further discovered documents in Ramsundar's A-file demonstrating that Ramsundar had longstanding knowledge of and familiarity with the terrorist organizations in Trinidad and Tobago in which he had alleged Petitioner was involved, including specifically those groups' actions in South Florida.  (*See* Dkt. 196-16; Dkt. 196-17; Dkt. 196-18).[9]  In other words, there is substantial evidence that Ramsundar—who was convicted of 19 counts of impersonating a federal officer in order to steal from fellow immigrants (*see* Dkt. 196-20; Dkt. 196-21) and who was repeatedly admonished by the FBI in his prior work as a confidential informant (*see* Dkt. 196-19)— completely fabricated the allegations against Petitioner.[10]  Incredibly, this evidence was contained in the government's own records (namely, Ramsundar's A-file), yet it was not until it was independently obtained by Petitioner's counsel that the government apparently performed any meaningful assessment of Ramsundar's credibility.

The other allegations of the February FBI Memo fare little better upon inspection. Many of the remaining claims arise from statements made by former BFDF detainee

---

[9]     Ramsundar was born in Trinidad and claims to have fled in 1994 because of the danger he and his family faced from terrorists.  (*See* Dkt. 196-16 at 2).

[10]     Indeed, as this Court has previously observed, the evidence "was sufficiently damning that Respondent . . . determined not to call Ramsundar as a witness, acknowledging that there are 'concerns about [Ramsundar's] credibility and ability to truthfully testify.'"  (Dkt. 225 at 24 (quoting Dkt. 180 at 2)).

Ahmed Hamed ("Hamed").  According to a Department of Homeland Security Report of Investigation dated January 15, 2020, Hamed was interviewed by Homeland Security Investigations special agents on November 30, 2017, and reported that: (1) on November 7, 2017, he had an argument with Petitioner regarding religion and how the Koran defines the use of violence; (2) Petitioner told Hamed that it was "good to kill someone not of the same ideology"; (3) Petitioner identified himself as a follower of ISIS leader al-Baghdadi; (4) when Hamed self-identified as American, Petitioner stated that Hamed "deserve[d] to die with them"; and (5) Petitioner stated that he did not care about killing innocent people because "it only hurt[s] the body not the soul."  (Dkt. 169-4 at 3).

The Court previously held that Hamed's statements had sufficient indicia of reliability to be admissible at the then-anticipated evidentiary hearing, without opining on their persuasive value.  (Dkt. 225 at 34-35).  However, the Court also noted that there were serious questions regarding Hamed's credibility inasmuch as he had been convicted of a fraud-related offense.  (*Id*.).  Further, Hamed's account of the argument he had with Petitioner differs from the account of Ahmed Abdelraouf ("Abdelraouf"), who was also present during the interaction.  Abdelraouf—who was scheduled to give live testimony at the evidentiary hearing before it was cancelled at Respondent's request—reported in an interview on January 28, 2020, that Petitioner did not talk about being a follower of any religious group or leader and that he "did not know of [Petitioner] making any threats against any specific person or place."  (Dkt. 169-3 at 4).  Accordingly, Hamed's statements are at best weak evidence of Petitioner's dangerousness.  Indeed, Respondent has conceded that these statements, even in combination with the other evidence he intended to present

at the evidentiary hearing, are insufficient to prove even by a preponderance of the evidence that Petitioner's release would threaten national security.

The February FBI Memo is seemingly also based on statements by former BFDF detainees Mohammed Hirsi ("Hirsi") and Hector Rivas Merino ("Rivas Merino"). As to Rivas Merino, as the Court explained in concluding that his hearsay statements were insufficiently reliable to be admissible in this proceeding, he claimed to have overhead Petitioner discussing making explosives with another detainee. (Dkt. 225 at 28-29). However, the record revealed that the overheard conversations were in Arabic, a language in which Rivas Merino was not fluent; Rivas Merino's report was uncorroborated; and he was offered a benefit in exchange for the information. (*Id.*). Moreover, as Petitioner points out, less than three weeks after Rivas Merino allegedly reported this information, ICE released the detainee with whom Petitioner was allegedly speaking, and the FBI apparently investigated the allegation and closed the file. (Dkt. 248 at 16). This undercuts any conclusion that the government took the report from Rivas Merino seriously.

Turning to Hirsi, a Department of Homeland Security "Intelligence Report" from March 2018 stated that he reported that Petitioner had been trying to "radicalize young Muslims." (Dkt. 248-11 at 2). However, in a sworn declaration dated March 27, 2020, Hirsi made no allegations whatsoever that Petitioner was trying to recruit or radicalize other inmates at the BFDF, but instead stated only generally that Petitioner had talked about hating the United States. (Dkt. 248-12 at 3-4).

The allegations set forth in the February FBI Memo are also flatly contradicted by an interview conducted with BFDF detainee Mohammad Al Abed ("Al Abed") on

February 24, 2020.  (Dkt. 248-9 at 3-4).  Al Abed, who was on Respondent's witness list for the evidentiary hearing (*see* Dkt. 173 at 1), reported that Petitioner "did not claim to have any connections in other countries," that Al Abed "did not know of any attempt to radicalize or recruit other detainees by" Petitioner, and that Petitioner "never discussed any extremist" group or any terrorist activities (Dkt. 248-9 at 3).

In sum, the February FBI Memo is an amalgamation of unsworn, uninvestigated, and now largely discredited statements by jailhouse informants, presented as fact. Respondent's position, of which he will have to persuade an appellate court, is that it is constitutionally permissible to detain Petitioner for the rest of his life on the basis of this document, without any opportunity for a habeas court (or any other neutral decisionmaker) to test its claims.  This Court cannot find that this argument, which runs counter to well-established due process jurisprudence, has even a moderate chance of succeeding.

The Court is also unpersuaded by Respondent's contention that "Petitioner failed to take advantage of all the process offered to him" and thus "cannot plausibly complain of a lack of process."  (Dkt. 242-1 at 20).  Respondent has failed to cite any cases in his motion to support this argument, which the Court has already rejected.  (*See* Dkt. 55 at 20 n.7).

Respondent also argues that Petitioner cannot prevail on his claim that the regulation deprives him of due process because he "is already subject to supervision conditions due to his criminal conviction."  (Dkt. 241-1 at 20).  Not only did Respondent fail to make this argument in his opposition to the Petition, *see Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal."), he actually took the opposite

position, contending that "Respondent does not consider Petitioner's term of supervised release to have commenced" (Dkt. 54 at 2).  This was after having asserted in a prior submission to the Court that Petitioner "is now on a 20-year period of supervised release." (Dkt. 30 at 36).  Setting aside Respondent's fluctuating view as to whether Petitioner's supervised release term has commenced, he has failed to set forth any meaningful argument that the mere fact Petitioner is subject to supervision somehow eliminates the need for a neutral decisionmaker.

For all these reasons, Respondent has not demonstrated that he is likely to succeed on appeal with respect to detention under 8 C.F.R. § 241.14(d), nor even that he has a substantial case on the merits.

### 2.    Detention Under 8 U.S.C. § 1226a(a)

The Court next considers Respondent's contention that he is likely to succeed on appeal as to the lawfulness of Petitioner's continued detention under § 1226a(a). Respondent claims that the following are likely to be overturned: (1) the Court's ruling that an evidentiary hearing was warranted; (2) the Court's ruling that Respondent bore the burden of proving by clear and convincing evidence that the factual predicate for detention was satisfied; and (3) the Court's pre-hearing evidentiary rulings regarding the admission of hearsay evidence and denial of Respondent's late attempt to amend his witness and exhibit lists.  (Dkt. 241-1 at 22-28).  As with Respondent's arguments regarding the regulation, there are aspects of the Court's rulings regarding § 1226a that are indisputably fair ground for litigation.  However, considered as a whole, Respondent has not

demonstrated that he has a substantial chance of convincing an appellate court that § 1226a lawfully authorizes Petitioner's ongoing detention.

With respect to Respondent's contention that the Court lacked the authority to order an evidentiary hearing, it is well-established that in a habeas case "where the material facts are in dispute," the Court "has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." *Townsend v. Sain*, 372 U.S. 293, 318 (1963), *overruled on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *see also Schriro v. Landrigan*, 550 U.S. 465, 468 (2007) ("In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court.").

Respondent's argument to the contrary is that the Court was constrained to defer to the Department of Homeland Security's conclusions regarding Petitioner's dangerousness. (Dkt. 242-1 at 22-23). This argument ignores the plain language of § 1226a, which explicitly anticipates "judicial review of the merits of a determination made under subsection (a)(3) or (a)(6)" in a habeas proceeding. 8 U.S.C. § 1226a(b)(1). Further, Respondent's interpretation of § 1226a would, as with his argument regarding the regulation, allow for indefinite detention based on a non-adversarial, administrative finding completely insulated from review by a neutral decisionmaker. As discussed in detail above, due process will not countenance such a result.

Moreover, as the Court explained in rejecting this argument the first time Respondent advanced it:

deferential review of the type urged by Respondent is generally reserved for cases where a court is "examining an administrative record developed after an adversarial proceeding," and "[a]ny process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity for the [petitioner] to demonstrate otherwise falls constitutionally short."

(Dkt. 75 at 13 (alterations in original) (quoting *Hamdi*, 542 U.S. at 537)); *cf. Parhat v. Gates*, 532 F.3d 834, 850 (D.C. Cir. 2008) ("We . . . reject the government's contention that it can prevail by submitting documents that read as if they were indictments or civil complaints, and that simply assert as facts the elements required to prove that a detainee falls within the definition of enemy combatant.  To do otherwise would require the courts to rubber-stamp the government's charges, in contravention of our understanding that Congress intended the court to engage in meaningful review of the record." (quotation omitted)).

Further, in his reply, Respondent acknowledges that § 1226a provides "robust procedures," including "Article III evidentiary review."  (Dkt. 250 at 14).  In other words, Respondent appears to concede that this is not a standard immigration habeas proceeding, where the Court's ability to review the administrative determination is circumscribed. Respondent has not demonstrated a serious question with respect to his contention that this Court lacked the authority to order an evidentiary hearing to assist it in its role as factfinder.

Respondent has further not demonstrated a serious question as to his contention that the burden of proof should have been allocated to Petitioner in the first instance. Respondent is, of course, correct that "the traditional rule in habeas corpus proceedings is that the petitioner must prove, by the preponderance of the evidence, that his detention is

illegal." *Bolton v. Harris*, 395 F.2d 642, 653 (D.C. Cir. 1968) (footnote omitted). However, in a <u>traditional</u> habeas case, the petitioner has already had the benefit of an adversarial proceeding, with all the attendant procedural protections. *See Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) (explaining that the burden is on the petitioner in a standard habeas proceeding because the Court must afford a "presumption of validity" to a criminal judgment). By contrast, in this case, this habeas proceeding is the first time the government has had to convince anyone other than itself of the propriety of Petitioner's detention.

In the case of non-citizen aliens held as enemy combatants at Guantanamo Bay, the D.C. Circuit has approved the imposition of a preponderance of the evidence standard on the government, while leaving open the question of whether a lower standard of proof might be constitutionally adequate. *See Ali v. Trump*, 959 F.3d 364, 372 (D.C. Cir. 2020). However, the D.C. Circuit has not suggested that it would be constitutionally adequate to put the burden on the petitioner. *See, e.g.*, *Al-Bihani v. Obama*, 590 F.3d 866, 878 n.4 (D.C. Cir. 2010) (declining to "address whether a some evidence, reasonable suspicion, or probable cause standard of proof could constitutionally suffice for preventative detention of non-citizens seized abroad who are suspected of being terrorist threats to the United States," but not suggesting that the burden could be placed on the petitioner). Moreover, in other contexts involving preventative detention based on dangerousness, the Supreme Court has made it clear that the burden is on the government. *See Foucha v. Louisiana*, 504 U.S. 71, 86 (1992) (noting that "in civil commitment proceedings the State must establish the grounds of insanity and dangerousness permitting confinement by clear and

convincing evidence" and rejecting argument that the state could "continue to confine [the petitioner] . . . solely because he is deemed dangerous, but without assuming the burden of proving even this ground for confinement"); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (upholding Bail Reform Act's provision allowing for pre-trial detention based on dangerousness against due process challenge in part because "[i]n a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person").

Respondent has cited no cases in which the burden of proof has been placed on a habeas petitioner who has had no prior opportunity to test the allegations against him, and the Court does not find that he has a substantial chance of persuading an appellate court that such a procedure is permissible. *Liuksila v. Turner*, 351 F. Supp. 3d 166 (D.D.C. 2018), which Respondent cites in his motion papers (*see* Dkt. 242-1 at 25), is inapposite. *Liuksila* involved extradition proceedings, wherein "a magistrate judge conducts a preliminary hearing to determine whether the government can justify detaining and extraditing the accused." 351 F. Supp. 3d at 174. In other words, in the extradition context, there has been an initial, adversarial proceeding during which the government bore the burden of proof, and so the traditional habeas rules apply. *See Skaftouros*, 667 F.3d at 158 ("[C]ollateral review of an international extradition order should begin with the presumption that both the order and the related custody of the fugitive are lawful."). *Liuksila* says nothing about situations such as the one presented here, where there was no meaningful pre-habeas review of the legitimacy of the detention determination.

Notwithstanding the above, the Court does agree with Respondent that there is a significant legal question regarding the applicable standard of proof that should be placed on Respondent, and that it is possible an appellate court could find the preponderance standard sufficient to satisfy due process.  In the Court's view, this is the closest legal question presented in this litigation.  However, the resolution of this legal issue is academic at this stage because Respondent has conceded that he could not meet even the preponderance standard.[11]  In other words, even if Respondent prevails as to the standard of proof, it would not result in reversal of the Court's judgment, unless possibly if he were to also prevail with respect to his challenges to the Court's evidentiary rulings.[12]

---

[11]    Respondent's concession in this regard is reinforced by the decision not to pursue relief against Petitioner in the form of a violation of a supervised release, which would also place a preponderance of the evidence burden on the government, as discussed further below.

[12]    To be clear, the Court is not suggesting that Respondent could prove Petitioner's dangerousness by a preponderance of the evidence even with consideration of the excluded evidence.  The excluded evidence consisted of the hearsay testimony of three witnesses (Rivas Merino, Abbas Raza, and Sean Orlando Smith) and the live testimony of one witness (Vasily Ranchinsky).  For the reasons discussed above with respect to Rivas Merino and in detail in the Court's Decision and Order dated June 18, 2020, the statements of Rivas Merino and Abbas Raza have significant reliability issues.  (Dkt. 225 at 28-33).  With respect to Sean Orlando Smith and Vasily Ranchinsky, the information from these individuals was shared with the government in February 2020, Respondent's counsel was aware of the information prior to the deadline set for filing witness lists, and yet, Respondent concluded that the information from these individuals was not relevant at the time that witness lists were due on May 22, 2020.  (*Id.* at 38-39).  This seriously undermines any argument that somehow these witnesses would have tipped the scales and enabled Respondent to be able to show Petitioner's dangerousness even under a preponderance of the evidence standard.

The Court does not find that Respondent has a serious chance of convincing an appellate court that its evidentiary rulings—many of which favored Respondent—so hamstrung Respondent's presentation of evidence as to warrant reversal. "Unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Fed. R. Civ. P. 61; *see Banister v. Davis*, 140 S. Ct. 1698, 1705 (2020) ("The Federal Rules of Civil Procedure generally govern habeas proceedings."); *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) ("While in a narrow sense Rule 61 applies only to the district courts, it is well-settled that the appellate courts should act in accordance with the salutary policy embodied in Rule 61. Congress has further reinforced the application of Rule 61 by enacting the harmless error statute, 28 U.S.C. § 2111, which applies directly to appellate courts and which incorporates the same principle as that found in Rule 61." (citations omitted)); *Phipps v. Raemisch*, 795 F. App'x 561, 577 (10th Cir. 2019) (applying Rule 61 harmless error analysis in habeas action), *cert. denied*, No. 19-8226, 2020 WL 3038362 (U.S. June 8, 2020); *Godbolt v. Russell*, 82 F. App'x 447, 452 (6th Cir. 2003) (same); *Henard v. Anderson*, 27 F. App'x 693, 696 (7th Cir. 2001) (same).

Respondent has made only a cursory argument in support of his contention that an appellate court will likely reverse based on the Court's evidentiary rulings. There were two witnesses who Respondent timely identified as relevant—Rivas Merino and Abbas Raza—that the Court excluded from consideration largely based on their lack of reliability, including because one of the witnesses (Rivas Merino) reported information from a

conversation overhead in his non-native language.  Respondent argues that in excluding hearsay statements by these two former BFDF detainees the Court "[did] not account adequately for the 'extensive efforts' the FBI engaged in to locate" the detainees, particularly in light of the COVID-19 related travel restrictions, and that the Court "did not soundly account for the high degree to which former detainees were personally familiar with Petitioner and how their hearsay statements were based on those experiences."  (Dkt. 242-1 at 27).  Respondent's first argument is untethered to the record.  The Court faulted the government, in certain cases, for not having sought to depose detainees before they were deported, but never so much as hinted that the FBI's post-deportation efforts to locate them were inadequate or that it was excluding any statements on this basis.  Further, the Court acknowledged as to each of the hearsay witnesses that they had been detained with Petitioner at the BFDF but found, for reasons explained in detail in its Decision and Order of June 18, 2020, that the hearsay was nonetheless insufficiently reliable to be of probative value in this proceeding.  The Court did not, as Respondent argues in reply, "inhibit [itself] from assessing the relevant facts" to make its ultimate decision in this matter.  (Dkt. 250 at 19).  Instead, the Court thoroughly assessed the hearsay evidence at issue and concluded that it was so unreliable on its face as to be of no use to the Court in making its factual determinations.  While Respondent is certainly free to disagree with that assessment, he has fallen far short of demonstrating that it was not only erroneous but so erroneous as to constitute harmful error.

Respondent also references the Court's denial of his belated request to amend his witness and exhibit lists (see Dkt. 242-1 at 26-27), but offers no substantive argument as

to the alleged error in these determinations. The Court denied Respondent's request because it was made after the Court-ordered deadline and because he offered no plausible reason for his failure to timely disclose the witnesses and exhibits in question. Indeed, the Court must emphasize that the reason that Respondent attempted to amend his witness list at the eleventh hour, even though he was well aware of these witnesses prior to the Court's deadlines, is because his case fell apart once it was discovered that his key witness— Ramsundar—was not credible, based on evidence that Respondent had access to but never investigated until it was brought to his specific attention by Petitioner's counsel. Under the circumstances, the Court has no reason to think an appellate court would disturb this ruling, which was well within its discretion. *See Tapia Macareno v. Sessions*, 738 F. App'x 29, 30 (2d Cir. 2018) ("[A] district judge[] has broad discretion to set and enforce filing deadlines.").

For all these reasons, the Court finds that Respondent has not demonstrated a likelihood of success on the merits or even a substantial case that supports imposition of a stay pending appeal. The first factor weighs in favor of denial of the motion.

### C.   <u>Irreparable Injury</u>

The second factor the Court considers on a motion for a stay pending appeal is whether the moving party will suffer irreparable injury absent such a stay. Respondent argues that irreparable harm will inure to the government absent a stay, even in light of the stringent conditions of supervision imposed by the Court, because: (1) Petitioner represents a threat to national security; (2) Petitioner intends to reside in south Florida, "the very setting of his prior criminal activity"; and (3) Petitioner's past conduct renders his

likelihood of reoffending high.  (Dkt. 242-1 at 27-29).  In his reply, Respondent identifies another claimed irreparable harm: "interference with Executive authority, expressly conferred by Congress[.]"  (Dkt. 250 at 21-22).

As discussed above, because Respondent has not demonstrated that he has a substantial case for appeal, his burden of demonstrating irreparable harm is correspondingly higher.  He has not met it.

With respect to Petitioner's alleged dangerousness, the Court has already explained in detail why the allegations in the February FBI Memo are weak and unpersuasive.  Far from demonstrating that Petitioner is so dangerous that he must be detained, the February FBI Memo illustrates a more potent danger—the danger of conditioning an individual's liberty on unreviewable administrative factfinding.  *See Boumediene*, 553 U.S. at 797 ("Security subsists, too, in fidelity to freedom's first principles.  Chief among these being freedom from arbitrary and unlawful restraint[.]").

The record regarding the underpinnings of the June FBI Memo is less developed, in significant part due to the government's own failure to timely disclose the witnesses and exhibits it relied on in compiling this document.  However, what is before the Court shows that the June FBI Memo suffers from many of the same infirmities as the February FBI Memo, in that it merely asserts as fact a hodgepodge of allegations by jailhouse informants, without any independent corroboration.  *Cf. Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004) (noting research showing that "jailhouse informants have a significant incentive to offer testimony against other defendants in order to curry favor with prosecutors and that the proffered testimony is oftentimes partially or completely

fabricated").  For example, the June FBI Memo again asserts as fact Rivas Merino's and Hamed's accusations, despite the significant reliability issues discussed above.  (*See* Dkt. 223 at 3).  The June FBI Memo does not provide a credible basis for concluding that Petitioner is so dangerous that his release on strict conditions of supervision will cause irreparable harm.

Further, in identifying the evidence that he claims supports a finding of dangerousness, Respondent has mischaracterized the Court's evidentiary rulings. Respondent states that the Court "excluded from evidence" statements made by Abdelraouf regarding Petitioner, but Respondent effectively withdrew the request to present hearsay testimony of Abdelraouf because he intended to present Abdelraouf as a live witness at the evidentiary hearing.  The Court in fact made significant efforts to accommodate the government's efforts to secure Abdelraouf's live testimony, including allowing Abdelraouf to testify remotely via video and making the Court's staff available, on multiple occasions, to test the video conferencing software.  It was ultimately Respondent's decision to seek cancellation of the evidentiary hearing, thereby ensuring that Abdelraouf's testimony would not become part of the record in this case.

Similarly, Respondent cites to information that the Court excluded from Sean Orlando Smith and Vasily Ranchinsky purportedly supporting a conclusion as to Petitioner's dangerousness (Dkt. 250 at 24), but in reality, it was Respondent who effectively excluded consideration of this evidence from the record by failing to identify this proof as part of his witness or exhibit lists in accordance with the Court's deadlines. By Respondent's own admissions, he did not initially identify these individuals because he

did not believe the information they possessed was relevant—and yet now he claims that the information they possess is so critical that it shows irreparable harm if Petitioner is released. This argument does not hold together.

The government's conduct with respect to Petitioner also does not support the conclusion that his release will cause irreparable harm. The Court notes, as it has throughout this matter, that if the government truly thought it had credible evidence that Petitioner was recruiting for ISIS or engaging in the other behavior alleged in the February and June FBI Memos, it would either bring criminal charges or, at the very least, charge Petitioner with a violation of his supervised release. The standard of proof in a supervised released proceeding is only preponderance of the evidence, *see United States v. Cunningham*, 607 F.3d 1264, 1266 (11th Cir. 2010), the Federal Rules of Evidence do not apply, *see United States v. McKenzie*, 505 F. App'x 843, 846 (11th Cir. 2013), and hearsay evidence may be admitted if it is reliable and the court balances "the defendant's right to confront adverse witnesses against the grounds asserted by the government for denying confrontation," *United States v. Clay*, 743 F. App'x 366, 369 (11th Cir. 2018) (quotation omitted). Further, there is no question about the constitutionality of such proceedings. That the government has chosen, for unidentified reasons, not to avail itself of this routine and available vehicle for seeking to detain Petitioner seriously undercuts its claims as to his dangerousness and the threat purportedly posed thereby.

The Court also is not persuaded that Petitioner's criminal convictions show that there is a risk of irreparable harm. Respondent contends that "Petitioner's three terrorism-related criminal convictions have informed—and supported—the government's decision

making throughout." (Dkt. 250 at 4).[13] The judgment entered in the District Court of the Southern District of Florida reflects that Petitioner was convicted by a jury of conspiracy to murder, kidnap and maim persons in a foreign country in violation of 18 U.S.C. § 956(a)(1), conspiracy to provide material support for terrorism in violation of 18 U.S.C. § 371, and material support to terrorists in violation of 18 U.S.C. § 2339A(a). *United States v. Hassoun*, No. 04-60001-CR-COOKE, Dkt. 1335 at 1 (S.D. Fla. Jan. 22, 2008). The underlying conduct that served as the basis for those convictions ended almost twenty years ago. *See Jayyousi*, 657 F.3d at 1091 (noting that charged conduct began in October of

---

[13]     In support of the pending motion, Respondent cites to evidence introduced during the trial before the district court in Florida about Petitioner's discussions with co-conspirators using code words. (Dkt. 250 at 26). The Court notes that Petitioner's conviction was affirmed by the Eleventh Circuit Court of Appeals in a 2-1 decision, with Circuit Judge Barkett concurring in part and dissenting in part, noting: "The old adage that 'hard facts make bad law' is clearly evident here." *Jayyousi*, 657 F.3d at 1134 (Barkett, J., concurring in part and dissenting in part). Among other things, Judge Barkett disagreed with the majority opinion affirming the admission of the evidence on which Respondent now relies—testimony from the case agent providing lay witness opinion evidence about the meaning of various recorded conversations involving Petitioner and alleged co-conspirators. *Id.* at 1119-26. Although not dispositive of the pending motion, the Court does question whether a similar result concerning the admissibility of this evidence would have been reached in this Circuit or the D.C. Circuit. *See United States v. Hampton*, 718 F.3d 978, 982 (D.C. Cir. 2013) (district court abused its discretion allowing case agent to testify as lay witness about his understanding of recorded conversations played for jury); *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (case agent's testimony based on review of recorded telephone conversations was improper lay opinion testimony under Rule 701); *United States v. Dukagjini*, 326 F.3d 45, 55-56 (2d Cir. 2003) (case agent strayed beyond permissible limits in providing expert witness testimony concerning taped conversations, acting at times as a summary prosecution witness); *see also United States v. Freeman*, 730 F.3d 590, 596 (6th Cir. 2013) (describing split among the circuits on this issue, with the Second and D.C. Circuit disagreeing with the Eleventh Circuit).

1993 and continued until November 1, 2001); *see also Hassoun*, No. 04-60001-CR-COOKE, Dkt. 1335 at 1 (offenses of conviction ended November 1, 2001).

The sentencing court imposed a below-Guidelines sentence of 188 months incarceration, with 20 years of supervised release to follow. *Hassoun*, No. 04-60001-CR-COOKE, Dkt. 1335 at 1-3. While the government successfully appealed the below-Guidelines sentence imposed on Defendant's co-defendant Jose Padilla, it did not pursue an appeal of Petitioner's sentence. *See Jayyousi*, 657 F.3d at 1115-19.

The sentencing judge's comments at sentencing reflected a clear view that while Petitioner's crimes of conviction were serious, they did not warrant a sentence anywhere near the recommended Guidelines sentence of 360 months to life. (Dkt. 248-16 at 4). As the sentencing judge explained:

> The crimes here are very serious, but I think it's important at this juncture to state what this case is not about. No so-called act of terrorism occurred on United States soil. These defendants did not seek to damage United States infrastructure, shipping interests, power plants or government buildings. There was never a plot to harm individuals inside the United States or to kill government or political officials. There was never a plot to overthrow the United States government.
>
> The defendants maintain that their acts were not criminal, but [of] educational and humanitarian nature to inform the world and the Muslim community of the status of Muslims abroad to provide aid for Muslims in need. The jury's verdict reject[ed] these arguments and contentions and found that the defendants' acts were criminal.
>
> What the defendants sought to do was provide support to people sited in various conflicts involving Muslims around Eastern Europe, the Middle East and Northern Africa was found to be criminal. The evidence indicated the defendants sought to provide financial, personnel and material to individuals engaged in armed conflict in these areas. This material support is a violation of the statutes that form the basis of this indictment.

However, there is no evidence that these defendants personally maimed, killed or kidnapped anyone in the United States or elsewhere.

Also, the government has pointed to no identifiable victims.  Despite this, this behavior is a crime.

(Dkt. 248-16 at 5-6).

Mr. Hassoun is a devout Muslim.  Prior to the instant offense, Mr. Hassoun had never been arrested or convicted of a crime.  As a youngster, he lived with a Lebanese conflict, and he knew firsthand what happened to a country when internal politics turned violent.  His employer and fellow employees describe him as smart, compassionate and a caring human being.  He reached out to people in this community here and overseas, often giving of himself personally and financially.  Many wrote letters of support to the Court.  The plight of Muslims throughout the world pained and moved him.  These strong feelings were his motivation to violate the statutes in this case.  He knew what it was like to live through armed conflict and religious persecution.

The defendant moved to this country, worked, married and had a family.  He worked for Marcom Technologies.  His employer and fellow employees spoke highly of him.  He was  a valuable employee.  He worked with many employees of many different religions and ethnicity, and there was never any evidence of conflict between Mr. Hassoun and other employees based upon religious beliefs.

The government intercepted most of Mr. Hassoun's telephones, work, home, cell and fax.  The interceptions and investigation continued for many, many years.  He was questioned and never charged with a crime.  The government knew where Mr. Hassoun was, knew what he was doing and the government did nothing.

This fact does not support the government's argument that Mr. Hassoun poses such a danger to the community that he needs to be imprisoned for the rest of his life.

(*Id.* at 7-8 (emphasis added)).

It should also be noted that an incarcerative sentence also recognizes that these defendants will unlikely engage in new criminal conduct, given their age, as they leave the criminal system; that is, as they approach their senior years.

(*Id.* at 14).  In other words, among other things, the sentencing judge in this case expressly found that Petitioner was unlikely to reoffend upon completion of his sentence. Respondent dismisses the sentencing court's comments as "simply an alternative conclusion drawn from the facts."  (Dkt. 250 at 5).  However, the sentencing judge's conclusions cannot be so cavalierly disregarded.  She presided over a trial lasting four months, *Jayyousi*, 657 F.3d at 1091, and plainly was intimately familiar with the facts of the case and Petitioner's background.

It is also worth noting that Respondent appears to place great emphasis on his arguments concerning § 241.14(d) in support of his request for a stay, and yet, the issues with respect to the regulation were finally determined by this Court in its Decision and Order entered December 13, 2019.  In other words, if the government believed that it was likely to succeed on appeal with respect to that issue, and that irreparable harm would result if Petitioner was not continued in detention under the regulation, it could have sought to pursue an interlocutory appeal some six months ago.  Instead, Respondent waited until the eve of the evidentiary hearing scheduled by this Court to file an emergency motion to cancel the hearing and seek a stay pending appeal.

Finally, the Court is not persuaded by Respondent's argument, newly asserted in his reply brief, that the government will suffer irreparable harm absent a stay because this Court has somehow intruded on executive authority.  As this Court has explained throughout this proceeding, in enacting § 1226a, Congress made the express choice to provide for habeas review, including review of the merits of the underlying factual determinations.  This is not a case in which the Court is enjoining the government "from

effectuating statutes enacted by representatives of its people." (Dkt. 250 at 22 (quotation omitted)). The Court is enforcing § 1226a, which allows the government to detain an individual if and only if his release would threaten national security or the safety of any person or the community. Respondent concedes that he cannot prove that factual predicate is met, even by a preponderance of the evidence. In other words, on the record before the Court, Respondent cannot even show that it is more likely than not that the necessary conditions for ongoing detention are met. It is not a usurpation of executive authority for this Court to require the government to comply with express statutory conditions, even where issues of national security are concerned. *See Boumediene*, 553 U.S. at 765-66 ("[T]he writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers," and "the test for determining the scope of this [remedy] must not be subject to manipulation by those whose power it is designed to restrain.").

### D.   <u>Harm to Petitioner and the Public Interest</u>

The third factor—the harm to Petitioner that will result from a stay—clearly favors release. "The interest of the habeas petitioner in release pending appeal [is] always substantial[.]" *Hilton*, 481 U.S. at 777. Respondent does not contest this point, but argues that "[a]lthough Petitioner of course has an interest in avoiding any unlawful restraint, here the public interest outweighs his concerns." (Dkt. 250 at 25). The Court is not persuaded. Respondent's arguments regarding the public interest largely reiterate his arguments regarding dangerousness, which the Court has already considered. For example, Respondent argues that the government cannot assure Petitioner's compliance with conditions of supervision and that there is accordingly "a heavy burden on the

Government . . . [in] its ability to mitigate the danger that Petitioner poses to national security and public safety." (Dkt. 242-1 at 31). This argument presupposes that Petitioner in fact poses a danger to national security and public safety, a showing the government has been unable to make. Just as Petitioner's alleged dangerousness did not support the conclusion that the government would be harmed by his release on strict conditions of supervision, it also does not support the conclusion that such release is contrary to the public interest.

For all these reasons, and considering and weighing all the factors, the Court finds that a stay pending appeal is not warranted. However, recognizing the high stakes in this litigation, the Court will issue a brief administrative stay of its order of release. Specifically, the Court stays its order until 12:00 p.m. on Thursday, July 2, 2020. This will afford Respondent the opportunity to seek an emergency stay from an appellate court, and hopefully avoid the logistical difficulties that would result if the machinery of release was set in motion and Respondent then succeeded in obtaining such a stay.

## CONCLUSION

For the foregoing reasons, the Court grants the Petition (Dkt. 1) and orders Petitioner's release, effective July 2, 2020, at 12:00 p.m., and subject to the conditions of supervision set forth above and agreed upon by the parties. The Court denies Respondent's motion for a stay pending appeal. (Dkt. 242). The Court will issue a separate order setting forth additional briefing deadlines with respect to Petitioner's outstanding motion for sanctions. (Dkt. 164).

- 42 -

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:       June 29, 2020
             Rochester, New York